Cummings, Secretary of State, *et al. v.* Beeler,
Attorney General, *et al.*

(*Knoxville,* September Term, 1949.)

Opinion filed October 10, 1949.

WILLIAM F. BARRY, Solicitor General, ALLISON B. HUMPHREYS, JR., and HARRY PHILLIPS, Assistant Attorneys General, for appellants, Beeler and Hunt.

JOHN A. PRITCHETT, of Nashville, for appellant Election Com'rs.

WILLIAM L. FRIERSON, of Chattanooga, W. RAYMOND DENNEY and CECIL SIMS, of Nashville, for appellees.

154

MR. JUSTICE BURNETT delivered the opinion of the Court.

This suit was initiated by the Secretary of State of the State of Tennesee in his official capacity and by a citizen and taxpayer of the State against the Attorney General of the State of Tennessee and the Comptroller of the State of Tennessee and the Election Commission of Davidson County, Tennessee.

The purpose of the suit was to have the Court declare the rights, status, duties and obligations and other legal relations of the parties as affected by Chapter 49 of the Public Acts of 1949. The bill further averred that the Statute is constitutional and asked that the Court so declare.

The defendants filed a joint demurrer asserting that no justiciable controversy existed between the parties under the averments of the bill. After argument was heard and the matter was considered by the Chancellor, he held that the bill stated a justiciable controversy and that the parties defendant were before the Court and accordingly overruled the demurrer. Thereafter 'the defendants Attorney General and Comptroller filed a joint answer, and the defendants, Election Commissioners jointly filed a separate answer. The cause was

then heard on bill and answer. The Attorney General and the Comptroller raise the same question which they had raised in their demurrer, that is, that bill did not present a justiciable issue. Election Commissioners admit a justiciable issue is made by the bill. They say also that there is indeed grave doubt as to whether or not the Act in question is constitutional. They ask that the Chancellor pass on this question. The Chancellor declared the Act constitutional; that the bill presented a justiciable issue and that correct parties defendant were before the court.

The Attorney General and Comptroller have prayed a special appeal to this Court and have assigned error raising the single question of whether or not the bill presents a justiciable controversy under our Declaratory Judgments Act. The Election Commissioners prayed a broad appeal to this Court. They say that question which the Attorney General and Comptroller have raised was correctly decided by the Chancellor.

The Attorney General and Comptroller, by their appeal, say three questions are involved, namely:

"1. Does this case present a justiciable controversy between adversary parties?

"2. Can a declaratory judgment properly be entered when the real question involved is premature and contingent and may never arise in the future?

"3. Are the parties to this suit entitled to a declaratory judgment?"

The Board of Election Commissioners of Davidson County assign error to the holding of the Chancellor that the Act in question is constitutional.

We must first see what is necessary to make a justiciable controversy, in any particular proceeding,

156

under the Declaratory Judgment Law (Section 8835 et seq., of the Code of Tennessee) before passing to the question presented, that is, whether or not the allegations of the bill herein and the parties thereto are sufficient for the bill to be filed under this Act. This Court in *Miller* v. *Miller*, 149 Tenn. 463, 261 S. W. 965, 972 in construing the Declaratory Judgments Act said: "It follows, therefore, from the foregoing authorities, that the only controversy necessary to invoke the action of the court and have it to declare rights under our declaratory judgments statute is that the question must be real, and not theoretical; the person raising it must have a real interest, and there must be some one having a real interest in the question who may oppose the declaration sought. It is not necessary that any breach should be first committed, any right invaded, or wrong done. The purpose of the act, as expressed in Section 12 thereof, is to 'settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; and is to be liberally construed and administered.' "

We have frequently held that the jurisdiction to render a declaratory judgment is discretionary. *Tennessee Eastern Electric Co.* v. *Hannah*, Commissioner, 157 Tenn. 582, 12 S. W. (2d) 372; 16 Am. Jur., page 287.

Does the present controversy or proceeding present such an issue as to bring this case within the requirements of the Declaratory Judgments Act as above outlined? We think that it does. In the first place the controversy as presented in these proceedings is real and not theoretical. The legislature has passed the Act heretofore referred to (Chapter 49 of the Public Acts of

1949) in which the Secretary of State is required to spend large sums of money in holding a special election on November 8, 1949. This is real, not theoretical. The Attorney General, who is the official interpreter of the laws for the Secretary of State and the defendant Comptroller, has declared in an official opinion concerning similar legislation proposed prior to the Act in question that legislation of the kind would be illegal, void and unconstitutional. In his demurrer and likewise in his answer in the instant case, even though he does not rely upon this fact, the Attorney General states that he has not changed his mind.

The Election Commissioners, who are parties defendant to this suit have certain specific duties to perform under the Act. They allege in their answer that there are serious doubts as to the validity of Chapter 49 of the Public Acts of 1949 and that these doubts were greatly strengthened by the published opinion of the Attorney General of Tennessee, rendered prior to the passage of the Act in question.

It seems to us that the question is not merely a theoretical question. We have an Act of the legislature mandatorily requiring a State official to spend public funds to hold a special election on November 8, 1949.

The Secretary of State is required to spend this State money. He must either obey the mandatory provisions of this law which the Attorney General has previously publicly declared as unconstitutional or he must disregard the law entirely. If the Secretary of State decides to follow the mandates of the statute and spend the public funds and then it develops that the Attorney General was correct in his opinion in holding that the law was invalid and unconstitutional, the Secretary of State would have

spent public funds under the authority of a law which was illegal and without effect. This expenditure would have been made in face of the declared official opinion of his official legal adviser that the law was invalid and unconstitutional. It would therefore clearly appear that the Secretary of State has a real interest, officially, in determining whether or not the legislation is valid before spending these public funds.

In *Miller* v. *Miller, supra,* this Court said: "There must be some one having a real interest in the question who may oppose the declaration sought."

█ Code Section 8845 prescribes who are necessary parties to a declaratory judgment proceeding. In this Code Section the Attorney General of the State is required to be "served with a copy of the proceeding" when the constitutionality of an act is attacked. We have construed this section to require the Attorney General to be a party defendant in any proceeding where the constitutionality of the Act of the legislature is before the Court on declaratory judgments proceeding. *Buena Vista Special School District* v. *Board of Election Com'rs. of Carroll County,* 173 Tenn. 198, 116 S. W. (2d) 1008.

The complainants in their bill are seeking a declaration as to the validity of the Act in question. The Attorney General has ruled that like legislation would be invalid and unconstitutional. The Secretary of State is required to spend large funds out of the State Treasury if the Act is constitutional. On the other hand, if the Act is invalid then he has no right to spend these funds. By the pleadings herein, both the Attorney General and the Comptroller of the State of Tennessee apparently take the position that they are not concerned with whether

or not the Secretary of State expends these funds. It is the duty of the Comptroller of the State to ". . . To draw warrants upon the treasury for the sums which upon such examination and adjustment, may be found due from the state, specifying in each warrant the date of its issue, the name of the person to whom payable, the nature of the claim for the payment of which the warrant is issued, the statute or authority under which the warrant issued." Code Section 201. Many of the duties of the Attorney General are set forth in Code Section 9956. Among other things therein required of him are: "to attend to all of the business connected with the management of the treasury of the state, or debts due and owing to the state, or debts or liabilities claimed against the treasury of the state, . . ." And "to give to the officers of the state, when called on, written legal opinions on all matters submitted by them in the discharge of their official duties."

██ Under these clear statutory enactments setting forth the duties of the State officers it seems to us clearly that they are interested in the matter and interested in advising the other officers of the State as to whether or not they should spend these State funds. It likewise seems clear that the Comptroller of the State would not authenticate or approve the payment of warrants for State funds paid out under an invalid and unconstitutional statute. The Attorney General of the State who is his official legal adviser is naturally the one that he would go to before he pays out warrants under a legislative act. State officials are presumed to do their duty and we feel sure and have no hesitancy in saying that they will and do do their duty as they see it. Would it not be the duty of the Comptroller to refuse to approve these

warrants when he knows that his official legal adviser has held that the Act under which these warrants were to be issued was illegal, invalid, and unconstitutional? It therefore seems clear to us that these two State officials, who are made defendants hereto, are proper parties and parties who have an interest in the matter.

The Election officials who are party defendants hereto likewise aver that there is grave doubt as to the validity of the Act in question and that this doubt is strengthened by the former opinion of the distinguished Attorney General. They also allege that they feel that they would not be doing their public duty if they do not question the Act before being parties to spending the public funds under an Act which they assign on their appeal as being unconstitutional. It therefore seems to us that the Chancellor was clearly within his limits and has not gone beyond his discretionary power in holding the averments, and the parties to the present suit, presented a proper subject of a Declaratory Judgment. As heretofore said the controversy was real and the parties had a real interest in the determination of the question. Clearly under the outline as to what is necessary under the Declaratory Judgments Statute this makes a case cognizable under the Declaratory Judgments Act. Code 8835 et seq., of Tennessee.

■ "This court is committed to a liberal interpretation of the Declaratory Judgments Act." *Hodges* v. *Hamblen County*, 152 Tenn. 395, 277 S. W. 901, 902.

■ As we have heretofore said the Attorney General is a necessary and proper party defendant to this suit. To have a proper contradicter or some one to properly defend the action, who is a proper party thereto, it is not necessary that this proper party defend the same.

All that is necessary is that a proper party be brought before the Court and then he *may* defend the suit. No defendant, insofar as we know, is ever required to defend a suit of this character. It is not a must statute insofar as the defendant is concerned. It is a must statute insofar as the complainant is concerned that he must make the proper parties defendant but after this is done there is no absolute requirement that this defendant must defend. We have carefully read and re-read the excellent brief of the distinguished Attorney General herein and all of the authorities cited therein. It is not necessary and would extend this opinion to lengths beyond control if we undertook to take up each of these cases and distinguish them from our holding herein. Suffice it to say that each of these cases is based upon their own particular facts in view of the necessities under the Declaratory Judgments Act as hereinbefore reviewed.

Before reaching the next proposition presented by this appeal it might be well to review some of the proceedings which brought about the present litigation and which are averred in the complainant's bill herein.

The legislature of Tennessee of 1945 by Senate Joint Resolution No. 20, Pub. Acts 1945, p. 703, passed an Act naming a commission to make a study of needed changes in our present State Constitution. This Committee was duly named and began its work. Soon thereafter they submitted to the distinguished Attorney General of this State two specific questions, namely:

"(1) Can the Legislature, in submitting the question of calling a convention, propose one for the purpose of amending the Constitution in only specified particulars or amending only specified parts or sections of it?

"(2) If the Legislature proposes such a convention and the people vote for it will its purposes and amending powers be restricted as specified in the legislative Act?"

This Commission submitted certain proposed changes to the 1947 Legislature but no affirmative action was taken thereon. The Acts under consideration in this case (Chapter 49 of the Acts of 1949) was passed by the 1949 Legislature following the above recommendation of this Commission.

In answer to the two questions above propounded to the distinguished Attorney General, he, in an official published opinion on May 16, 1946, expressed the view "that the legislature, being one of the three coordinate branches of government, cannot limit the subject which can be considered by a constitutional convention."

He answered both questions in the negative. As has been frequently referred to in this opinion, the opinion of the Attorney General was written long prior to the enactment of the legislation here in question. It is alleged in the bill before us that this opinion of the Attorney General is still outstanding. In other words that the Attorney General has never retracted this opinion. The Attorney General by his answer herein does not raise the question of the constitutionality of the Act under attack, but does say that he is still of the same mind that he was when he rendered his opinion on May 16, 1946.

Clearly it seems to us that by thus retaining the same position that he did prior to the enactment of this Act that the opinion expressed, prior thereto, is equally applicable to the officers under the Act which was passed and which had been declared invalid and unconstitutional by the Attorney General.

The Attorney General in rendering this opinion in 1946, rendered it to a duly constituted body in response to an official request by this body. It is a part of his duties as Attorney General to render opinions upon such request. This opinion which we have read many times shows an extended, careful investigation of the questions involved. It is an excellent treatise on the question. The Attorney General in advising the Commission and expressing his official opinion thereon sets forth many authorities to support his views. He likewise gives the Commission the advantage of authorities which hold to the contrary. In the end of this opinion the Attorney General advises this Commission on the policy of pressing constitutional changes at that time. Of course this question, as to the policy or political expediency of pressing these amendments at the time, is as the Attorney General said merely his personal views and not an official legal opinion.

At the oral argument of this case before us, the writer of this opinion asked the distinguished Solicitor General whether or not any difference would be made in the case if the Secretary of State had been sued and required to carry out the terms of the Act in question. The Solicitor General in effect conceded that this would make a different situation. He cited numerous cases, which had been cited by the complainants, and in each instance showed that therein the parties had questioned the constitutionality of the Act in question by proper pleading. On argument he insisted that by thus questioning these Acts, by a proper pleading, that then you have the necessary defendants and a justiciable issue is made. We have shown heretofore that it is not necessary for the defendants to question the constitutionality of the Act if

the proper parties are before the Court. It then becomes the duty of the Court, when the proper parties are before it, to declare the rights of the parties under the pleadings before the Court. The actualities of the situation as presented by the record must be looked to by the Court.

There is no question in our mind but that if the Secretary of State had refused to carry out the requirements of the Act in question that then *mandamus* would lie to require him to submit to a vote of the people the question of the proposed amendments proposed by the Legislature. What can be the difference when the Secretary of State wanting to carry out his duties filed a suit himself against the necessary parties who have questioned the Act? As we view it the situation must meet the same answer provided the requisites hereinbefore set out are met in the proceeding.

It is said by the learned Attorney General that the real question "involved is premature and contingent and may never rise in the future," and for this reason a Declaratory Judgment should not be entered. We must frankly admit that in investigating the authorities on the question as to the constitutionality of the Act herein that many things come within these authorities and must somewhat come within our view that are premature and contingent. This though does not keep us from having to pass on the constitutionality of this Act under the allegations of the bill herein.

The complainants in their excellent brief say: "The purpose of this proceeding is to have the Court declare the duty and responsibility of the Secretary of State in expending public funds to hold the election set for November 8, 1949—and there is no prayer for a declaration as to the legal effect of delegates exceeding the

limitations prescribed in the Act, and in the event a constitutional convention is voted by the people.''

Again it is said by the appellees in their brief that: ''The question before the Court at this time is the single question of whether or not Chapter 49 of the Acts of 1949 is a constitutional, legislative enactment.''

The averments in the prayer to their bill clearly bear out these statements. In the prayer the Court is asked to determine whether or not the Secretary of State can safely carry out the mandatory provisions of this Act in holding the election on November 8, 1949. The Court is asked to determine whether or not the Act is constitutional for this purpose. In view of what we have heretofore held as to the justiciability of the question involved it is now necessary for us to determine whether or not the Act in question is a constitutional Act insofar as the questions last above proposed are concerned.

In the brief for the appellees we find a very accurate and succinct summary of Chapter 49 of the Public Acts of 1949—the Act in question—as follows:

''The preamble to the Act expressly refers to Senate Joint Resolution No. 20, adopted by the 74th General Assembly of the State of Tennessee, under which the Governor appointed the Constitution Revision Commission to study the needs for revising the Tennessee Constitution with the duty to report its recommendations to the Governor to be transmitted to the legislature. It further recites that the Commission after extensive research and consideration reached the conclusion that the Constitution should be amended only in certain particular sections, and did not require general revision, and that the Commission further reported that the proper and expeditious method of accomplishing this result

would be by a convention whose authority would be limited by vote of the people to the consideration of amending the particular sections of the Constitution suggested for consideration by the Commission.

"Thereupon the legislature determined that it was in the public interest that it, as the designated agency, submit to the people of Tennessee:

" '. . . the question of whether or not such a Convention, whose authority and actions shall be so limited, shall be called and held, and whose action in such matters shall be subject to ratification by the people, in whole or in part, the Legislature acting merely as the designated agency to enable the people of Tennessee to determine the question of whether or not such a limited Convention shall be held; . . .'

"To accomplish this purpose the legislature called a special statewide election to be held on November 8, 1949 at which election it submits to the voters the question of whether a convention should be held whose scope and consideration would be limited to proposing amendments to nine sections of the Constitution. The voter is permitted to vote either for or against the convention, in the usual way, and Section 1 of the Act provides:

" 'If the number of votes cast for the Convention shall be greater than the number of votes cast against the Convention, such Convention, whose authority and actions shall be limited as above provided, shall be assembled and held and delegates thereto shall be elected as hereinafter provided.'

"The Act further provides that in the event the majority of the votes cast is for the convention a special election is called to be held on April 25, 1950, for the selection of delegates to the convention. The Act pre-

scribes in detail the method of selecting delegates and provides that the convention shall assemble in the House of Representatives at Nashville on May 15, 1950, and organized by selecting its President, Secretary, and other officers, adopting rules of procedure, and taking the other requisite steps for the holding of the convention.

"Section 6 of the Act provides that the convention shall certify its final action to the Secretary of State.

"Section 7 of the Act provides that each amendment proposed by the convention shall be separately submitted to the voters of the State for ratification or rejection at an election to be held in such manner and on such date after the final adjournment of the convention as may be fixed and determined by the convention. Each proposed amendment is voted upon separately and such proposed amendments as may be approved by majority vote of the people will become a part of the Constitution.

"The Act specifically provides:

" 'All amendments that may be approved in the election held for that purpose shall be proclaimed by the Governor as a part of the Constitution of the State and his proclamation shall be filed in the office of the Secretary of State.' "

Is the Act in question a valid or invalid Act under the existing constitution and laws of Tennessee?

Article 11, Section 3 of the Constitution of Tennessee provides as follows: "Section 3. Amendments to the constitution, etc.; not oftener than once in six years; but legislature may at any time submit question of calling convention—Any amendment or amendments to this Constitution may be proposed in the Senate or House of Representatives; and, if the same shall be agreed to by a majority of all the members elected to each of the two

Houses, such proposed amendment or amendments shall be entered on their journals with the yeas and nays thereon, and referred to the General Assembly then next to be chosen; and shall be published six months previous to the time of making such choice; and if, in the General Assembly then next chosen as aforesaid, such proposed amendment or amendments shall be agreed to by two-thirds of all the members elected to each House, then it shall be the duty of the General Assembly to submit such proposed amendment or amendments to the people, in such manner, and at such times as the General Assembly shall prescribe. And if the people shall approve and ratify such amendment or amendments, by a majority of all the citizens of the State, voting for Representatives, voting in their favor, such amendment or amendments shall become a part of this Constitution. When any amendment or amendments to the Constitution shall be proposed, in pursuance of the foregoing provisions, the same shall, at each of the said sessions, be read three times on three several days in each House. The Legislature. shall not propose amendments to the Constitution oftener than once in six years. *The Legislature shall have the right, at any time, by law, to submit to the people the question of calling a Convention to alter, reform or abolish this Constitution, and when, upon such submission, a majority of all the votes cast shall be in favor of said proposition, then delegates shall be chosen, and the Convention shall assemble in such mode and manner as shall be prescribed.*"

We have italicized the last sentence of the above quoted provision of the Constitution because it is under this sentence that the appellees claim that the Act in question is constitutional.

A similar provision to that above quoted appears in the Constitution of 1796, Article 10, Section 3, but the last sentence (that italicized by us) does not appear in the Constitution of 1796. This Constitution (1796) provided, that the General Assembly "shall recommend" and, if the people vote favorably the General Assembly "shall . . . call a convention . . ." The Legislature of 1883 did thus call a convention which adopted the Constitution of 1834.

Article 11, Section 3 of the Constitution of 1834 is the same as the first part of Article 11, Section 3 of the Constitution above quoted, except that in the Constitution of 1870 the word "then" is added at one place and the word "the" is deleted at another in the Constitution of 1870. As heretofore said the last sentence (that italicized by us) of the Constitution of 1870 was added by the constitutional convention of 1870, and this is the first time that it appears in any of our Constitutions.

■■ ■■ It will be noted that Article 11, Section 3 of the Constitution of 1870, above quoted, has two parts. First it provides for an amendment to the Constitution which may be proposed in the senate or in the house and agreed to by a majority of all of the members elected by the two houses and then referred to the general assembly next to be chosen, with publication six months previous to the time of making such choice; and then if the general assembly so chosen agrees by a two-thirds majority of all of the members elected to each house to the amendments, then it shall be the duty of the general assembly to submit such proposed amendments to the people and if they ratify such amendments they should become a part of the Constitution. This section of the Constitution is generally referred to as the Amendment

route. We judicially know that certain amendments have been proposed under this route to our Constitution during the last several years. Insofar as we are advised the Constitution as it now exists has not been attempted to be altered, reformed or amended by the second provision. This second provision is that as italicized above and might be called the Constitutional Convention Route. Whether one route or the other is followed is purely a matter delegated to the discretion of the Legislature, that is, the Legislature has the power to propose to the people that the Constitution be amended under one or the other course. After this proposal is made by the Legislature to the people, the people who are sovereign may decide to follow the route proposed or not. It is purely a question for the people, in the exercise of their sovereign power, to follow the proposal of the Legislature or not as they see fit.

 We are not concerned with the wisdom or policy of what the Legislature proposes. We are interested only in whether what the Legislature proposes may be done under the Constitution—whether what is proposed is in conflict with and forbidden by the Constitution. We find nothing in the Constitution that forbids the proposal as set forth in the questioned Act. Insofar as we know it has always been held that an Act of the Legislature is valid unless it is prohibited by provisions of the Constitution. There is nothing in the Constitution that expressly or impliedly forbids the legislation here questioned.

It must be conceded that the Legislature may propose to the people that the Constitution be altered, reformed or abolished under the terms of the last sentence of the constitutional provision above quoted. Conceding this

authority in the Legislature, we must go further when the constitutionality of such proposal is attacked and determine whether or not the Legislature has the power to propose that the Constitution be amended in part and not as a whole. In doing this we must necessarily determine whether or not, if a convention is called by the people pursuant to the Act, such convention is bound by the terms of the Act upon which the people voted.

It will be clear to any one reading the last sentence of Article 11, Section 3 (above quoted) that the Legislature has the power to propose to the people the question of calling a convention "to alter, reform or abolish, this Constitution". When we read the Act in question it clearly seems that the Act simply submits to the people the question of whether or not they wish to have a convention possessing the limited powers which are defined in the Act. If the people vote in favor of such convention the people and not the Legislature will limit the work of the convention and its scope, and the convention to be held will be limited in its authority to affecting the amendments submitted to and approved by the electors.

The authorities generally support the proposition that in those states in which the Constitutions make no provisions for a convention that then the Legislature may propose to the people an Act which limits the topics to be considered by the convention and if such restrictions are approved by the popular vote they are binding on the convention. See excellent annotation to *Staples* v. *Gilmer*, 183 Va. 613, 33 S. E. (2d) 49, 158 A. L. R. 495, at page 515. These authorities generally support the proposition, which seems to us sound, that the Legislature may submit to a popular vote the question of having a constitutional convention with restricted powers.

The power of the legal voters to approve such convention exists unless forbidden by the Constitution itself. Our Constitutional provision (last sentence Article 11, Section 3) contains no prohibition against submitting limited questions to the people. We have made a careful study of the Constitution and find nowhere therein a restriction or limitation on such precedure. We are, therefore, placed in the same category as are those states whose Constitution does not contain a constitutional provision for a convention. Our Constitution authorizes the Legislature "to submit to the people the question of calling a Convention to *alter, reform* or *abolish* this Constitution, . . ." The very language of the Constitutional provision (last sentence Article 11, Section 3) leaves it to the discretion of the Legislature as to the form of the submission to the people of what they should vote on. The constitutional provision specifically authorizes that it may be in the alternative of "alter, reform or abolish." The form of the question is not specified. Therefore it seems clear to us that this provision of the Constitution authorizes the Legislature to submit to the people, who are sovereign, to vote on whether or not the convention should be called to consider such questions as were proposed by the Legislature to be considered by the convention.

The only judicial determination of a parallel issue was determined in favor of the position that the appellees take in this case in the case of *Staples* v. *Gilmer*, 183 Va. 613, 33 S. E. (2d) 49, 55, 158 A. L. R. 495. Section 197 of the Virginia Constitution provided that a majority of the members elected to each house may submit to the electors the question "shall there be a convention to revise the Constitution and amend the same?"

By an Act the Virginia general assembly proposed to submit the above question to the electors, with the added provision that if a constitutional convention were approved, the delegation of power to a convention by the people should be limited to constitutional amendments regarding the right to vote "by members of the armed forces while in active service in time of war." Acts Va. 1944, Ex. Sess., C. 1.

It is perfectly obvious that the powers of a proposed constitutional convention in our Constitution are much broader than those of the Virginia Constitution. In the Virginia case the Court said: "If the electors vote in favor of a convention, it may amend the Constitution as well as revise it, and where the legislature, in the performance of its representative function, asks the electors if they desire a convention to amend or revise a certain part of the Constitution but not the whole Constitution, an affirmative vote of the people on such question would have the binding effect of the people themselves limiting the scope of the convention to the very portion of the Constitution suggested to them by the legislature. The wishes of the people are supreme. Some agency must ascertain the desire of the people, and the legislature, by Section 197, has been selected by them to do so."

The Legislature is merely the channel through which the proposed constitutional amendments are proposed for the peoples' consideration. The Legislature does not call the convention. The people call the convention. The controlling element in a situation of the kind before us, that is, when the Legislature proposes that the people have a right to vote on certain proposed propositions in amending their Constitution, is the popular approval

of the legislative proposal. The legislative proposal becomes controlling only when it has the approval of the people by a majority vote. In *State ex rel. McCready* v. *Hunt,* 1834, 2 Hill, Law, S. C., 1, 223 the court said: "It is true, the legislature cannot limit the convention; but if the people elect them for the purpose of doing a specific act or duty pointed out by the act of legislature, the act would define their powers. For the people elect in reference to that and nothing else."

And as said in the case of Wood's Appeal 75 Pa. 59, at page 72: "The right of the people to restrain their delegates by law cannot be denied, unless the power to call a convention by law, and the right of self protection, be also denied. It is, therefore, the right of the people and not of the legislature to be put by law above the convention, and to require the delegates to submit their work for ratification or disapproval. . . . To estop them from their right to accept or reject the work of the convention, there must be an evident channel pointed out through which their power passed to the convention to ordain at pleasure a constitution or binding ordinances. "

Daniel Webster in his argument before the Supreme Court of the United States in the case of *Luther* v. *Borden,* 7 How. 1, 12 L. Ed. 581, in arguing that the Legislature might propose to the people and the people vote constitutional amendments, when there was no provision in the Constitution for it, after speaking of the established American doctrine of popular sovereignty, he said: "Another American principle growing out of this, and just as important and well settled as is the truth that the people are the source of power, is that, when in the course of events it becomes necessary to ascertain the will of the

people on a new exigency, or a new state of things or of opinion, the legislative power provides for that ascertainment by an ordinary act of legislation. . . . It is enough to say that, of the old thirteen states, the constitutions, with but one exception, contained no provision for their own amendment. ...Yet there is hardly one that has not altered its Constitution, and it has been done by conventions called by the legislature, as an ordinary exercise of legislative power. ...We see, therefore, from the commencement of the government under which we live, down to this late Act of the State of New York, one uniform current of law, of precedent, and of practice, all going to establish the point that changes in government are to be brought about *by the will of the people, assembled* under such *legislative provisions* as may be necessary to ascertain that will, truly and authentically." Works of Daniel Webster, VI, 227-229. (Italics ours).

Further implementing what is said above the framers of our Constitution have provided by Section 1 of the Declaration of Rights: "That all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety, and happiness; for the advancement of those ends they have, at all times, an unalienable and indefeasible right to alter, reform, or abolish the government in such manner as they may think proper." This may be found at page 179 of Volume 1 of the Code.

 The power to "alter, reform or abolish" the Tennessee Constitution resides in the people, not in the Legislature. The people are possessed with ultimate sovereignty and are the source of all State authority. The people have the ultimate power to control and alter their

Constitution, subject only to such limitations and restraints as may be imposed by the Constitution of the United States. Cooley's Const. Limitations, 8th Ed., Vol. 1, page 84.

It is not the legislature who limit the scope of a convention but it is the people themselves who by their vote under the terms of this act limit the scope of the convention. The Constitutional provision above quoted does not prohibit the revision or amendment of a part of the Constitution by the convention method. The purpose of the Act here is to revise or amend the Constitution in the particulars indicated provided the convention called concludes that it is necessary to so amend and then if they so conclude the people have another right to vote as to whether or not these amendments, as set forth in a convention called, shall be a part of our Constitution. The thing that the people call a convention for is not to revise or to write a new Constitution but only a part thereof. The people having thus voted to circumscribe the limits of their elected convention delegates, in the particulars as provided for in the Act, bind these delegates within these limits.

In a well considered case, *In re Opinion to the Governor*, 55 R. I. 56, 178 A. 433, 452, the justices said: "The Legislature merely proposes the conditions. It is the vote of the people for the convention that ratifies them and makes them binding upon the delegates. 6 R. C. L., Section 18, page 27. For this reason, in order that the delegates be so bound, it is necessary for the General Assembly to propose the conditions before the election is held, and to take all necessary steps to bring them to the attention of the people seasonably before the time of voting at the election."

Again, in *Opinion of the Justices,* 6 Cush. 573, at page 575, 60 Mass. 573, at page 575 this was said: "...If however, the people, should by the terms of their vote decide to call a convention of delegates to consider the expediency of altering the constitution in some particular part thereof, we are of opinion that such delegates would derive their whole authority and commission from such vote; and, upon the general principles governing the delegation of power and authority, they would have no right, under such vote, to act upon and propose amendments in any other parts of the constitution not so specified."

Mr. Walter F. Dodd, author of The Revision and Amendment of State Constitutions, and other works, has recently written an article for the Vanderbilt Law Review, Volume 2, No. 1 for December, 1948, wherein he concludes, after reviewing authorities pro and con and a study of our Constitution that the Act in question can be validly passed.

The length of this opinion prohibits a review of the cases holding to the contrary of the conclusions here reached. Suffice it to say that the conclusion here reached clearly is in conformity with reason, logic, the weight of authority and in conformity with the clear intendment of the provisions of our Constitution.

In *Wright* v. *Cunningham,* 115 Tenn. 445, at page 463, 91 S. W. 293, at page 297 this Court said: "Suffice it to say that questions of State constitutional law are, in a very important sense, peculiarly local; and in every jurisdiction the court of last resort must decide for itself the meaning of the Constitution under which it exists, and the validity of laws enacted by the legislative branch of the government. The decisions of other courts, constru-

ing constitutions containing similar provisions, can be, at most, only suggestive and advisory.''

We have given this matter an unusual amount of study, investigation and thought and are of the opinion that the Act in question, Chapter 49 of the Acts of 1949, does not contravene any provision in the Constitution and is therefore valid; that in the event of a majority of the electors vote in favor of the convention, the powers of the convention to consider, adopt or propose revisions or amendments to the Constitution will be legally restricted or limited, as defined in the Act, and the informatory statement printed on the ballot to be used in the proposed referendum election. The opinion of the Chancellor must therefore be affirmed.

All concur.

MR. JUSTICE PREWITT (concurring).

The bill in this cause seeks a declaratory judgment to test the constitutionality of Chapter 49 of the Public Acts of 1949. The Chancellor held that a justiciable issue was presented and the Act was valid.

Under this Act an election is called to be held on November 8, 1949. If the vote is in favor of a limited constitutional convention, an election of the delegates will be held later and the limited convention held in Nashville. The people of the State will then have an opportunity to approve or reject, by an election, the recommendations made by the limited convention.

The declaration was sought by the Secretary of State in his official capacity, in whose office is lodged the principal duties pertaining to the proposed limited convention. The Attorney General of the State, the Comptroller, and the three members of the Davidson County Election Commission are defendants.

We think the proper parties are before this Court and the question presented is not theoretical but real. This Court can take judicial knowledge of the fact that the question presented here has been the subject of many newspaper articles and editorials, and has also been freely discussed publicly and privately throughout the State.

Section 8835 of Williams' Code provides: "Courts of record within their respective jurisdictions shall have the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declaration shall have the force and effect of a final judgment or decree."

Section 8836 of the Code provides: "Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status or other legal relations thereunder."

This Court is committed to a liberal interpretation of the declaratory judgment act. *Hodges* v. *Hamblen Couny*, 152 Tenn. 395, 277 S. W. 901; *Tennessee Eastern Electric Co.* v. *Hannah*, 157 Tenn. 582, 12 S. W. (2d) 372.

By Section 8846 of the Code it is provided: "This article is declared to be remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and is to be liberally construed and administered."

Some three years ago the Constitution Revision Commission, a legal entity, called on the Attorney General of the State for an opinion as to the constitutionality of a proposed act to be passed by the Legislature providing for a limited constitutional convention. The Attorney General answered by letter, giving his opinion that the proposed act would be unconstitutional. Following the opinion given by the Attorney General, there was much discussion over the State by public officials, and others, as to whether the proposed act would be valid. There were eminent lawyers on the Commission who differed with the Attorney General, and the Act under consideration was later passed by the Legislature in 1949, resulting in the institution of this suit. The matter of holding an election, and other matters connected with a limited constitutional convention, will entail the expenditure of large sums of public money, and we think the people are entitled to an opinion by this Court as to the legality of the Act. The question presented is, therefore, real and not theoretical, and presents a justiciable controversy.

In Anderson on Declaratory Judgments, Section 8, we find the following language:

"... We should not be led into misapprehension as to the strict character of the justiciable controversy necessary to the maintenance of a declaratory judgments action and it may well be said that the only controversy necessary to invoke the action of the court and have the declaration of rights under the declaratory judgments statute is that the difference must be real and not theoretical, the parties raising it must have a real interest and there must be some one having a real interest in the question who may oppose the declaration sought.

"It is not necessary that any breach of duty should be first committed, any right invaded, or any wrong committed. The very purpose of the declaratory judgments statute, as expressed within the Uniform Act, is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and to place a restricted construction upon this language would be to delete from the statute a beneficent provision, inserted therein by virtue of legislative authority. It should be kept constantly in view lest we lose the benefit of this instrumentality of justice, that it is to be liberally construed and freely applied in cases coming within its terms."

In the present cause, we think a proper case is presented where the provisions of the declaratory judgment act can be invoked.

Argument is made that the Constitution expressly provides how it can be amended and this method is exclusive unless a convention is called, as provided by Article 11, Section 3, of the Constitution.

We think this contention is conclusively met when we read Article 1, Section 1, of the Constitution, which is as follows: "That all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety, and happiness; for the advancement of those ends they have, at all times, an unalienable and indefeasible right to alter, reform, or abolish the government in such manner as they may think proper."

The last sentence of Section 3, Article 11, of the Constitution (after setting out how the Constitution could be amended) reads: "The Legislature shall have the right, at any time, by law, to submit to the people the

question of calling a Convention to alter, reform or abolish this Constitution, and when, upon such submission, a majority of all the votes cast shall be in favor of said proposition, then delegates shall be chosen, and the Convention shall assemble in such mode and manner as shall be prescribed.''

While the framers of the Constitution of 1870 set out clearly how it could be amended, they still reserved to the people the right to ''alter, reform or abolish'' the Constitution. Therefore, it seems clear that the power of the Legislature to submit the question of a limited constitutional convention might well rest on either Section 1, Article 1, or Section 3, Article 11, of the Constitution. These two Sections are in absolute harmony and evince an unquestioned intent by the framers of the Constitution to reserve to the people the right to ''alter, reform or abolish'' the Constitution at any time they might deem it proper.

It should be borne in mind that if the people vote on November 8, 1949, for a limited constitutional convention they will later elect delegates to the convention. The action of delegates would be only recommendatory, and before any of the provisions recommended by the delegates become effective they must be ratified by the people in an election called for that purpose. This is not a case where, if the delegates exceed the powers given them by the Legislature, there would be no remedy. This being true, we think the decree of the Chancellor should be affirmed.