JACK'S COOKIE CORPORATION, Appellee,

*v.*

GILES COUNTY and UNION PLANTERS NATIONAL BANK,
Appellants.

407 S.W.2d 446.

(*Nashville,* December Term, 1965.)

Opinion filed September 27, 1966.

James O. Moore, of counsel, Moore & Van Allen, Charlotte, N. C., for Jack's Cookie Corp.

D. C. Lee, of counsel, Lee & Lee, Pulaski, for Giles County.

Thomas R. Price, of counsel, Canada, Russell & Turner, Memphis, for Union Planters National Bank.

Mr. Justice White delivered the opinion of the Court.

Complainant, Jack's Cookie Corporation, filed its original bill in the Chancery Court of Giles County seeking a Declaratory Judgment against Giles County and the Union Planters National Bank as to the disposition of certain funds held by the Union Planters National Bank, as Trustee. It appears that Giles County, pursuant to a resolution dated June 1, 1962, issued general revenue and tax deficiency bonds to provide money to construct

and equip an industrial building to be leased to complainant, Jack's Cookie Corporation. The rent to be paid by Jack's Cookie Corporation is to be used to pay the interest on the bonds and eventually retire them. The Bank serves as Trustee for all parties, including the bondholders; and it holds and disburses all funds, both the proceeds from the sale of the bonds and the rental income. The Bank is also individually an owner of some of the bonds.

The whole transaction was executed pursuant to the Industrial Building Revenue Bond Act of 1951 (T.C.A. sec. 6-1701 to 6-1716) and the Industrial Building Bond Act of 1955 (T.C.A. secs. 6-2901 to 6-2916). The bonds issued under the 1951 Act will be subsequently referred to as 1951 revenue bonds, and the bonds issued under the 1955 Act will be referred to as 1955 revenue and tax deficiency bonds. The bonds were issued in a total aggregate amount of $2,500,000.00.

The specific amount of money, the disposition of which is questioned in this lawsuit, is the sum of $144,637.90. From the proceeds of the bonds, there was set aside a total amount of $300,000.00 ($150,000.00 from the proceeds of the sale of each type of bond) for the purpose of insuring that the bond interest would be paid during the construction period, that period being from June 1, 1962 until July 1, 1963, the rentals from Jack's Cookie Corporation beginning upon the later date. The $144,-637.90 represents an over-estimate of the interest costs during the construction period.

During the construction period, complainant paid for four large items of machinery necessary to equip the plant. Upon discovering the existence of the said sum of $144,637.90, complainant sought to have this money

applied to the cost of the machinery, and so requisitioned the Trustee, appellant here. The Trustee refused to honor such requisition.

■ In addition to the resolutions of the Quarterly County Court of Giles County, dated June 1, 1962, and the lease between the county and the complainant, dated the same day, there is also in the record a document entitled "Indenture of Mortgage and Deed of Trust" dated June 1, 1962, parties to which are all three of the participants in this lawsuit. This mortgage and deed of trust incorporates, by reference, the resolutions of the Quarterly County Court and the lease between the county and complainant. It would seem, then, that all three documents should be construed together in determining the intent of the parties as to the disposition of any excess in the amount originally set aside to pay the interest costs during the construction period. Appellants filed a demurrer to complainant's bill, as amended, which demurrer was overruled. In overruling the demurrer the chancellor below ruled that the $144,637.90 should be applied, as contended for by the complainant, to construction costs solely. The appellants assert that this money is properly part of a "reserve" amount for future principal and interest payments on the bonds. Giles County, by its answer in this case, had indicated that it maintains a somewhat neutral position. The chancellor granted Appellant Union Planters National Bank a discretionary appeal from his order overruling the demurrer, and that appeal has been perfected in this Court.

The five assignments of error can be grouped generally under three headings: (1) The chancellor erred in allowing the complainant to sue Union Planters National Bank as representative of all the bondholders. That is, appel-

lant claims that all of the bondholders should have been made parties to this action. (2) The chancellor erred in allowing complainant to bring this suit, the complainant having no substantial right, title or interest in the funds in question, and thus no bona fide controversy exists under the provisions of the Declaratory Judgment Act. (3) The chancellor erred in applying the funds to construction costs instead of applying them, as appellant contends, to a reserve for the payment of principal and interest upon the outstanding bonds.

■ As to the first general issue of whether all necessary parties are before the Court, it is submitted that the chancellor below was correct in not demanding that the bondholders be made parties-defendant. Union Planters National Bank is sued as Trustee under the mortgage and deed of trust document, and in this capacity represents the interests of the bondholders. In this capacity, its interest in the defense of this case is insured because of its duty as a fiduciary to the bondholders. In 36 Am. Jur., Mortgages sec. 19, this type of representation in legal proceedings is recognized:

> The trustee in a deed of trust in the nature of a mortgage is regarded as representing all the bondholders, and not merely a majority of them. In this connection, it may be laid down as a general rule that although the trustee cannot act for or bind the bondholders as to matters extraneous to his trust or beyond his authority, he does represent and is competent to act for the bondholders in matters legitimately pertaining to the execution of his duties and within the scope of his powers. The trustee is generally regarded as representing the bondholders in all legal proceedings carried on by him

affecting his trust to which the bondholders are not actual parties.

This type of representation under the Uniform Declaratory Judgments Act, specifically T.C.A. sec. 23-1107, has been recognized in the analogous situation of the administrators of the Dental School of the University of Tennessee as representing the students in that school. *Powers v. Vinsant,* 165 Tenn. 390, 54 S.W.2d 938 (1932).

Another reason for allowing a suit against the Bank as representing the bondholders is that the Bank, as alleged in the amendment to the original bill, is a substantial bondholder itself; it holds approximately $330,-000.00 of the bonds. Thus, it may be said that this is a class action under the doctrine of virtual representation, recognized in Tennessee in the case of *Barnes v. Fort,* 181 Tenn. 522, 181 S.W.2d 881 (1944). It appears that a majority of cases deciding on this question support the doctrine of virtual representation as it is applied to declaratory judgment actions. See annotation in 71 A.L.R.2d 723, at 735 (1960), where this conclusion is drawn:

> Where the parties, either plaintiffs or defendants, who would be affected by a judgment, are so numerous that it would be impracticable to bring them all before the court, it has been held or recognized that the provisions of sec. 11 of the Uniform Declaratory Judgments Act will not preclude the bringing of a declaratory judgment action as a class action in which the parties appear by representation.

■ The second general issue is whether complainant has a sufficient interest under any of these documents to properly have relief in a declaratory judgment action. In

other words, is some real interest of the complainant here in dispute? See *Cummings v. Beeler,* 189 Tenn. 151, 223 S.W.2d 913 (1949). Complainant desires to have funds in question applied, as with all other net proceeds from the sale of the bonds, to pay for the cost of certain industrial equipment. Without these funds this equipment would have to be purchased as a capital investment with attendant financing costs. If the funds in question are held in reserve for possible later interest payments, complainant does not have the *present* benefit of these funds. This negates any argument that complainant can have the benefit of this $144,637.90 as a reduction if he prepays his rental expenses after fifteen years of occupancy, as the lease provides, and is a good example of that old saying that "a bird in hand is worth two in the bush." It thus can be said that if complainant has a right to the funds, he certainly has an interest in them.

In determining complainant's right to the funds in question, in having them applied to the purchase price of certain industrial equipment, four documents must be construed: the statutes authorizing the issuance of bonds for industrial building construction, the resolution of the County Court of June 1, 1962, the lease between complainant and the County, and the indenture of mortgage and deed of trust involving all parties. As stated before, the mortgage and deed of trust specifically incorporates by reference the provisions of the resolution and the lease.

In the Code chapter authorizing industrial building revenue bonds, certain sections should be noted:

T.C.A. sec. 6-1704. In addition to powers which it may now have, any municipality shall have power under this chapter:

(2) To issue its bonds to finance in whole or in part the cost of the acquisition, purchase, construction, reconstruction, improvement, betterment or extension of any industrial building. The governing body of the municipality in determining such cost may include all cost and estimated cost of the issuance of said bonds, all engineering, inspection, fiscal and legal expenses, and interest which it is estimated will accrue during the construction period and for six (6) months thereafter on money borrowed or which it is estimated will be borrowed pursuant to this chapter.

(3) To rent or lease such industrial buildings to industrial or commercial concerns in such manner that rents to be charged for the use of the industrial buildings shall be fixed and revised from time to time so as to produce income and revenues sufficient to provide for the prompt payment of interest upon all bonds issued hereunder and to create a sinking fund to pay the principal of such bonds when due.

(4) To pledge to the punctual payment of bonds authorized hereunder and interest thereon the income and revenues to be received from such industrial buildings (including improvements, betterments, or extensions thereto thereafter constructed or acquired) sufficient to pay said bonds and interest as the same shall become due and to create and maintain reasonable reserves therefor.

T.C.A. sec. 6-1715. The governing body of a municipality issuing bonds pursuant to this chapter shall prescribe and collect rentals for industrial buildings and shall revise same from time to time whenever necessary so that the income and revenues to be derived from such rentals will always be sufficient to pay when due

all bonds and interest thereon for the payment of which such revenues are pledged, including reserves therefor.

Since some of the bonds were issued under the Industrial Building Bond Act of 1955, T.C.A. sec. 6-2901 et seq., is relevant here. The important provisions of this Chapter are essentially the same as those quoted from Chapter 17, of the same Title, the 1951 Industrial Building Bond Act.

Appellant cites two sections from these two chapters, specifically T.C.A. sec. 6-1707 and sec. 6-2908, for the proposition that

> * * * bond proceeds allocated to interest costs during the construction period and six months thereafter, pursuant to both the 1951 and 1955 Acts, but not actually expended for such purpose, may be validly pledged to secure the payment of such bonds by appropriate resolutions of issuer and by the terms of the mortgage or deed of trust securing the bonds.

It does not appear that these Code sections strictly support that proposition. The only applicable part of each of these sections referring to a reserve for the payment of principal and interest on the bond, is as follows:

> Any resolution authorizing the issuance of bonds under this Chapter may contain covenants as to (a) the use and disposition of the *rentals* from the industrial building for which said bonds are to be issued, and from any other industrial buildings owned by the municipality at the time, including the creation and maintenance of reserves; * * * (Emphasis supplied) T.C.A. sec. 6-1707.

T.C.A. sec. 6-2908 contains a similar provision.

There are two resolutions of the Quarterly County Court of Giles County, dated June 1, 1962. One of the resolutions deals with 1951 Act Revenue Bonds, and the other deals with 1955 Act Revenue and Tax Deficiency Bonds. The bonds were divided equally among these two types. In Section 3 of the first resolution it is provided that the bonds

* * * shall be payable solely from the income and revenues to be derived from said industrial building and secured by a mortgage on said industrial building, * * * (Emphasis supplied).

In Section 3 of the second resolution it is provided that the bonds

* * * shall be payable *primarily* from the income and revenues to be derived from said industrial building and secured by a mortgage on said industrial building, * * * (Emphasis supplied).

In the second resolution it is also provided in Section 3 that taxes may be levied, if necessary, to pay off the bonds. The resolutions do not authorize, however, that anything other than income and revenues derived from the industrial building (and taxes in the case of the 1955 bonds) be used to pay off the bonds, either principal or interest.

In Section 7 of each resolution there is this provision:

That there shall be and there is hereby created an account to be known as the ''Giles County Industrial Building Revenue Bond and Interest Redemption Fund'' (hereinafter sometimes referred to as the ''Bond Fund'') into which there shall be paid and set aside such portion of the income and revenues

from said industrial building as will be sufficient to pay promptly the interest on and principal of the bonds herein authorized as same become due. All accrued interest received at the time of issuance of the bonds shall be deposited in the Bond Fund, together with a sufficient portion of the proceeds of the bonds, to aggregate the sum of $150,000, which sum is hereby found to be necessary to pay a portion of the interest on the bonds during construction of the industrial building and which sum shall be used solely for that purpose.

       \*      \*      \*      \*      \*      \*

\* \* \* When all of the bonds authorized by this resolution have been retired, both principal and interest, any balance then remaining in the Bond Fund shall be returned to the county.

Section 7 of the 1955 Bond resolution reads essentially the same, except that the name of the fund is, of course, different. The provisions in the last sentence of the above quote come into play only when all of the bonds have been retired.

The lease between the county and the complainant provides, in Section 1, that the County, at its sole expense, will construct and equip the building in question, but that it limits its obligations not to exceed the net proceeds of the bond issue. It also states that the County will not issue the bonds in an aggregate principal amount in excess of the sum of the costs incurred by the County in connection with the building and equipment. Section 4 of the lease sets out the rental payments to be made by complainant. Part of these rental payments, for a period of fifteen years, after the date of the bonds, in an aggregate sum of $285,000.00, payable in monthly install-

ments, are to be put in reserve into the "Bond Fund" connected with the 1951 Act. At any time after fifteen years after the date of the bonds, complainant can prepay all of its remaining rental payment plus certain interest and call premiums, and be credited with the amount then on deposit in both Bond Funds. This would presumably include the $285,000.00 in reserve, plus what would be left (if this lawsuit were to turn out unfavorably for complainant) of the total of $300,000.00 set aside from the bond proceeds for the payment of interest costs during the construction period.

In the mortgage and deed of trust on page 3, the $150,000.00 set aside from the proceeds of the bonds to be put in each Bond Fund is referred to as being used "solely to pay interest on the revenue bonds." It is not mentioned that this money is to be used to pay interest *during the construction period.* However, since the mortgage and deed of trust incorporates by reference the resolutions and the lease, this total of $300,000.00 is part of the net proceeds to be used only to pay interest during construction. The application of the net proceeds from the sale of the bonds is set out, beginning at page 11 of the mortgage and deed of trust. Four separate funds are set up to be administered by the Trustee Bank; a construction fund for each type of bond and a "Bond Fund" for each type of bond. Accrued interest on each type of bond, plus $150,000.00 set aside from the sale of each type of bond is to be the original deposit in each bond fund. The balance of the proceeds is to be put in each of the construction funds. Any funds remaining in the construction fund after all construction expenses have been paid shall be transferred to the bond funds. At page 13 of the mortgage and deed of trust, the appli-

cation of income, specifically rentals, from the industrial building is set out. This corresponds essentially to the provisions of the lease and resolutions, including mention of the $285,000.00 reserve that is to be placed in the 1951 Bond Fund.

■ We are impressed with two conclusions to be drawn from the reading of all of these documents: The bonds and interest thereto are to be paid from the rental income from the building plus any reserves specifically set up; the only reserve specifically set up is the $285,-000.00 in the 1951 Bond Fund. The $300,000.00 set aside from the proceeds of the sale of the bonds, even though this was placed in the bond funds, was to be used solely for the payment of interest costs during the construction period; since the stated purpose of the net proceeds from the sale of the bonds is to be used to pay construction costs and any accrued interest, any over-estimate of the construction period interest costs must also be used for this purpose.

The chancellor's decision, therefore, is affirmed and the case is remanded for disposition not inconsistent with this opinion.

BURNETT, CHIEF JUSTICE, and DYER, CHATTIN and CRESON, JUSTICES, concur.