Selma Cash PATY, Appellant,

v.

Rev. Paul A. McDANIEL et al., Appellees.

Supreme Court of Tennessee.

March 7, 1977.

Selma Cash Paty, pro se.

Brooks McLemore Jr., Atty. Gen., Kenneth R. Herrell, Asst. Atty. Gen., Nashville, for appellant.

J. Thomas Mann, Thomas, Leitner, Mann, Warner & Owens, Chattanooga, Frederic S. Le Clercq, Knoxville, for appellees.

## OPINION

FONES, Justice.

The major issue in this case is whether the Tennessee Constitutional provision de-

claring ministers of the gospel and priests of any denomination whatever, ineligible to a seat in either house of the Legislature, violates the free exercise clause of the First Amendment to the Federal Constitution.

Public Acts 1976, Chapter 848, the Legislative call for a limited constitutional convention, established the qualifications of delegates as the same as those for membership in the House of Representatives, thus invoking Article IX, Section 1 of the Constitution of Tennessee that provides:

"Section 1. *Ineligibility of ministers and priests to seats in legislature.* —Whereas Ministers of the Gospel are by their profession, dedicated to God and the care of souls, and ought not to be diverted from the great duties of their functions; therefore, no Minister of the Gospel, or priest of any denomination whatever, shall be eligible to a seat in either House of the Legislature."

Appellant, Selma Cash Paty, a candidate for the office of delegate to the 1977 Constitutional Convention from the twenty-ninth (29th) district of Hamilton County, brought this suit to have appellee, Reverend Paul A. McDaniel, an opposing candidate, declared ineligible to serve, and to remove his name from the ballot.

Appellee defends on the grounds that Article IX, Section 1, violates the free exercise and establishment clauses of the First Amendment to the Constitution of the United States, and the equal protection clause of the Fourteenth Amendment.

The Chancellor observed that:

"The free exercise of religion must include the right to be a minister of the gospel as this is a tenet of the individual's belief."

He held that the exclusion of ministers from public office infringes upon the free exercise of religion guaranteed by the First Amendment and is therefore void.

Appellant insists that the exclusion of ministers fortifies the doctrine of separation of church and state, is directed against a profession, not the exercise of religion,

and that it is a natural and reasonable classification rather than a constitutionally impermissible invidious, arbitrary or capricious one.

In the trial court, appellant called appellee as her witness and established that Reverend McDaniel is pastor of the Second Missionary Baptist Church in Chattanooga; that he considers the ministry to be a profession and one of his many duties as such is to lead people to salvation; that if elected as a delegate to the 1977 Constitutional Convention he would not resign as a minister of the gospel, nor as pastor of the church he now serves. On cross-examination it was established that Reverend McDaniel has a Bachelors Degree in Political Science from Moorehead College, a Masters of Divinity from Colgate-Rochester Divinity School and a Masters in Sociology from the University of Rochester. Appellee testified that he could carry out his duties as a minister while serving as a delegate to the Constitutional Convention and that he had no knowledge of any objection on the part of his church to his candidacy or service as a delegate.

■ Upon its first arrival in this Court, the case was remanded to cure the deficiency of failure to make the Attorney General of Tennessee a party. T.C.A. § 23–1107, Rule 24.04, T.R.C.P., *Cummings v. Beeler,* 189 Tenn. 151, 223 S.W.2d 913 (1949); *Buena Vista Special School District et al. v. Board of Election Commissioners et al.,* 173 Tenn. 198, 116 S.W.2d 1008 (1938) and *Cummings v. Shipp,* 156 Tenn. 595, 38 S.W.2d 1062 (1928).

Upon remand, the Attorney General waived appearance in the trial court so that an expedited appeal to this Court might result in a decision before election day. That objective proved to be unattainable and he has filed, at the direction of the Court, a brief addressing all of the issues. He joins appellant in urging the constitutionality of Article IX, Section 1.

■ It has long been the established law that the First Amendment to the United

States Constitution is applicable to the States through the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

■ It is, of course, our responsibility to examine the decisions of the United States Supreme Court for principles and guidelines applicable to and determinative of the issues here, as that Court is the ultimate expounder of the United States Constitution.

■ But, in our view, we are also required to give weight to the well-established principle that courts must indulge every reasonable presumption of law and fact in favor of the validity of a state's constitutional provision that has been ratified by the people. *Snow v. City of Memphis,* 527 S.W.2d 55 (Tenn.1975); *Southern Railway Company v. Fowler,* 497 S.W.2d 891 (Tenn.1973); *People v. Sours,* 31 Colo. 369, 74 P. 167 (1903); *State v. Alderson,* 49 Mont. 387, 142 P. 210 (1914); *Weeks v. Ruff,* 164 S.C. 398, 162 S.E. 450 (1932); *State ex rel. Morgan v. O'Brien,* 134 W.Va. 1, 60 S.E.2d 722 (1948).

### I.

The history of Article IX, Section 1 reveals that it is identical to Article VIII, Section I of the original Tennessee Constitution, approved in 1796. That constitution was almost totally derived from the 1776 North Carolina Constitution and the 1784 Constitution of the lost State of Franklin. See, *Caldwell, Studies in the Constitutional History of Tennessee,* 77–101 (1907); see also *McClure, State Constitution Making,* 377–460 (1916).

Both North Carolina and Franklin had constitutional provisions prohibiting ministers from participating in government. North Carolina's read:

"XXI. That no clergyman or preacher of the gospel shall be capable of being a member of either the Senate, House of Commons, or Council of State, while he continues in the exercise of the pastoral function." *McClure* at 437.

The State of Franklin's was identical. *Williams, History of the Lost State of Franklin,* 339 at 345 (1933). The North Carolina Constitution also prohibited "receivers of public monies," "officers in the regular army or navy," "agents supplying the army or navy" and "athiests" as well as other government officials from serving in the legislature. *McClure* at 405.

During our first constitutional convention, an attempt was made to prevent ministers from serving in "any civil or military office or place of trust within this state" as well as the general assembly. *Journal of the 1796 Constitutional Convention,* 18 (1796). The attempt failed, *Id.* at 23. The Constitutional Conventions of 1835 and 1870 were unlimited, and the subject provision was readopted by each Convention and ratified by a vote of the people of Tennessee. In the one hundred eighty (180) year life span of this constitutional provision no challenge to its validity has reached this Court. It may or may not be of significance that over the entire period of our statehood, no minister or priest has heretofore felt sufficient infringement upon his free exercise of religion, by virtue of ineligibility to serve in the Tennessee Legislature, to litigate the question.

### II.

The only reported case our research has disclosed involving the identical issue we face in the case at bar, is *Kirkley v. State of Maryland,* 381 F.Supp. 327 (D.Maryland 1974). The U. S. District Court for the District of Maryland declared unconstitutional Article III, Section 11, of the Constitution of the State of Maryland prohibiting ministers or preachers of the gospel, or of any religious creed or denomination from service as Senator or Delegate. Defendants, the State of Maryland represented by the Governor and the Attorney General, for all intents and purposes, admitted the unconstitutionality of the provision and made no attempt to demonstrate any basis for the exclusion of ministers as State Legislators. The Attorney General of Maryland had is-

sued an opinion expressing the view that the section in question was unconstitutional. He concluded, in part, that its inclusion in the Maryland Constitution was due to "a nineteenth century view of the ministry not particularly complimentary to that calling and not prevalent today." 381 F.Supp. at 331.

The district judge added, "Another reason, no doubt, was to insure the separation of Church and State." *Id.* But, he observed that there are members of the clergy sitting in the Congress of the United States and in all probability in the legislatures of other states, and concluded that if this exclusion was necessary to insure the proper separation between church and state, the Federal Government would have done so.

The State of Maryland did not appeal from the decision of the district court.

We pause to examine the effect of the exclusion of ministers and priests from service in the legislature. It is not asserted by appellee that service in the General Assembly of Tennessee is a tenet of the Baptist faith, nor are we aware of any religious sect that asserts that seeking and serving in public office is a religious duty. It is purely a secular activity. But, it is also true that a minister or priest is faced with the choice of abandoning either his leadership role in religion or any hope of serving the people of his district in the State Legislature. We also recognize that there is some validity in describing the effect of Article IX, Section 1, as prohibiting legislative service because of a person's leadership role in a religious faith.

But the question may well be asked, does it in fact impede the free exercise of religion? Those who believe that all religious leaders should devote their entire time to ecclesiasticism will insist that no true religious leader would be deterred from accepting or retaining that role, because of exclusion from state legislative service; that religious leaders entering the political arena as candidates for public office, and their service in public office, would be detrimental and degrading to all religions and represent the ultimate violation of the admonition "Render therefore unto Caesar the things which are Caesar's; and unto God the things that are God's."[1] They would conclude that, at most, the Article constitutes a *de minimus* theoretical impediment to religion.

On the other hand, many would answer that it is a direct affront to all religion to disqualify the entire leadership of every religious sect from service in the state legislature and represents the ultimate in governmental interference with religion.

 All rhetoric aside, the subject provision simply does not impose any burden, direct or indirect upon religious belief or religious action. It is not religious belief, but the career or calling, by which one is identified as dedicated to the full time promotion of the religious objectives of a particular religious sect, that disqualifies. Ineligibility for service in the General Assembly in no way restricts religious action—except in the law making process of government—where religious action is absolutely prohibited by the establishment clause, as we read the decisions of the United States Supreme Court.

In *Everson v. Board of Education of Ewing Tp.,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1948), the Supreme Court said:

"Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa." 330 U.S. at 16, 67 S.Ct. at 512.

 Every First Amendment case with which we are familiar has involved governmental action said to interfere with religion or tend to favor one religion over another or favor all religious persons over non-religious persons. This case is unique, but clearly the above quoted sentence from *Everson* prohibits religious participation in the affairs of government to the identical extent that it prohibits governmental participation in religion. Parenthetically, a valid

1. *Matthew* 22:21.

argument might be advanced that the case at bar is analogous to and the validity of our constitutional provision is supported by the decision in *Illinois ex rel. McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), where utilization of tax supported public schools in aid of religious instruction was held to violate the establishment clause. The effect of the factual situation in *McCollum* may be said to have constituted religious interference with governmentally established secular institutions to promote religious goals. Of significance to the case at bar, the Court said:

"For the First Amendment rests upon the premise that both religion and government can best work to achieve their lofty aim if each is left free from the other within its respective sphere. Or, as we said in the *Everson* case, the First Amendment has erected a wall between Church and State which must be kept high and impregnable." 333 U.S. at 212, 68 S.Ct. at 465.

There is another consideration that, it seems to us, has significance on the issue under consideration. We can take judicial notice of the fact that Baptists, Methodists and Catholics separately and collectively, far outnumber other religious sects, both separately and collectively. Opening the door to service in the General Assembly by ministers and priests would grant a distinct advantage to ministers and priests of the three mentioned religions, over those of all other sects, because of the far more extensive voter base from which to launch a campaign for office. Also, political campaigns by ministers would naturally tend to pit religion against nonreligion. The potentially "divisive forces" considered significant in numerous First Amendment decisions of the Supreme Court are clearly present in sanctioning the candidacy of ministers and priests for legislative service.

We do not agree with appellee that the subject prohibition encroaches upon the freedom of belief of ministers and priests. We, of course, recognize the oft repeated interpretation that the First Amendment embraces two concepts—freedom to believe and freedom to act. "The first is absolute, but, in the nature of things, the second cannot be." *Cantwell v. Connecticut,* 310 U.S. 296 at 303, 60 S.Ct. 900 at 903, 84 L.Ed. 1213 (1940).

In our view, if any encroachment results from the ineligibility of ministers and priests to serve in the General Assembly of Tennessee it is an indirect burden on the freedom to act in the governmental sector. There the freedom of ministers and priests to act necessarily breaches the wall between church and state and collides with the establishment clause.

We are persuaded that *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961), is sufficiently analogous to the case at bar to control its disposition. In *Braunfeld,* the Court sustained a Sunday closing law even though conceding that it undoubtedly served to make the practice of religious beliefs of Orthodox Jewish merchants more expensive. A distinction was made between legislation that imposes only an indirect burden on the exercise of religion, and legislation that attempts to make a religious practice itself, unlawful.

As members of the Orthodox Jewish faith, appellants were required by their religious beliefs to close their places of business from nightfall each Friday until nightfall each Saturday. They alleged, and their allegations were assumed to be true, as the case was before the Court on a motion to dismiss, that the Sunday closing law forced them to make a choice between giving up their Sabbath observance, a basic tenet of their religious beliefs, or suffer serious economic loss. They also asserted that the statute would hinder the Orthodox Jewish faith in gaining new adherents, subjecting their religion to discriminatory treatment in violation of the free exercise clause of the First Amendment. Appellant Braunfeld, alleged that he would be forced out of business and would lose his capital investment if he could not open on Sunday.

In analyzing the effect of the Sunday closing law the Court observed that the

statute did not make unlawful any religious practices of appellants[2] or force them to say or believe anything in conflict with their religious tenets.[3]

". . . the Sunday law simply regulates a secular activity and, as applied to appellants, operates so as to make the practice of their religious beliefs more expensive. Furthermore, the law's effect does not inconvenience all members of the Orthodox Jewish faith but only those who believe it necessary to work on Sunday. And even these are not faced with as serious a choice as forsaking their religious practices or subjecting themselves to criminal prosecution. Fully recognizing that the alternatives open to appellants and others similarly situated—retaining their present occupations and incurring economic disadvantage or engaging in some other commercial activity which does not call for either Saturday or Sunday labor—may well result in some financial sacrifice in order to observe their religious beliefs, *still the option is wholly different than when the legislation attempts to make a religious practice itself unlawful.*" (Emphasis added) 366 U.S. at 605, 606, 81 S.Ct. at 1147.

Having concluded that the effect of the Sunday closing law upon appellants was the mere imposition of an indirect burden on the exercise of religion the Court continued:

"To strike down, without the most critical scrutiny, legislation which imposes only an indirect burden on the exercise of religion, i. e., legislation which does not make unlawful the religious practice itself, would radically restrict the operating latitude of the legislature.

. . . . .

. . . if the State regulates conduct by enacting a general law within its power, the purpose and effect of which is to advance the State's secular goals, the statute is valid despite its indirect burden on religious observance unless the State may accomplish its purpose by means which do not impose such a burden. See *Cantwell v. Connecticut,* supra (310 U.S. at pp. 304, 305, 60 S.Ct. 900)." 366 U.S. at 606, 607, 81 S.Ct. at 1147, 1148.

The Court found that Pennsylvania was justified in setting aside one day of the week as a day of rest, repose, recreation and tranquility; that it was beneficial to the public welfare to do so. Alternatives to designating Sunday as the single day of rest and of exempting Sabbatarians were rejected as undermining the State's goal of providing a single day of rest.

 The effect of Tennessee's constitutional provision prohibiting service in the General Assembly is to advance the State's goal of maintaining the separation between church and state, an imperative, constitutionally equal to the free exercise mandate. In our opinion, it is far higher on the scale of legitimate state goals than the mere convenience of having everyone rest on the same day, which sufficed in *Braunfeld.* If any burden can be said to be imposed upon the exercise of religion, it is indirect, minuscule, and does not make unlawful any religious practice. In all respects, the prohibition in the case at bar is upon firmer constitutional grounds than the Sunday closing law, sustained in *Braunfeld.*

But, the record in the case at bar contains neither facts, nor expert testimony to assist the Court in assessing the effect that void-

---

**2.** In contrast with *Reynolds v. U. S.,* 98 U.S. 145, 25 L.Ed. 244 (1879), where a statute prohibiting polygamy collided with Mormon belief in duty of males to practice polygamy; and *Prince v. Commonwealth of Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1943), where statute prohibiting sale of periodicals etc., in public places by girls under eighteen years of age collided with the Jehovah's Witness belief that it was a religious duty to perform such work.

**3.** As in *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) where state action required school children to salute the flag, action contrary to the religious beliefs of appellees therein. The state action was invalidated with strong emphasis upon the fact that appellee's religious belief did not collide with rights asserted by any other individual.

ing Article IX, Section 1 of our Constitution would have in breaching the wall between church and state. Appellant directs our attention to the not insignificant number of laws dealing with ministers as an occupation and generally conferring special privileges upon them as a class. Examples noted are their exclusion from the draft by the Selective Service Act of 1967, exclusion from jury service in Tennessee, the confidential communications statutes of this State and particular sections of the Internal Revenue Code all of which appellant implicitly asserts give ministers and priests special treatment. We are unable to perceive that any of the special legislation cited in appellant's brief dealing with ministers as an occupation provides any direct evidence in support of the allegations that their service in the State Legislature would violate the establishment clause of the First Amendment. However, such legislation does emphasize that ministers and priests occupy a very special position in our society, and that by virtue of their position, they have an influence upon many of their fellow men, that others cannot exert.

■ It seems to us that it can fairly be said, in affirmative support of appellant's position, that ministers and priests could be expected, if and when serving in the Legislature, to do everything within their professional and spiritual powers of persuasion to further the aims of religion by sponsoring, advocating and voting for legislation that could or might violate both the free exercise and establishment clauses of the First Amendment; that without regard to the degree of success they might achieve, such activity would constitute a divisive force sufficient to constitute a significant violation of the Doctrine of Separation of church and state; that history will reflect that all governmental action that has been condemned by the First Amendment and the judicial decisions interpreting same has been sponsored and enacted by religiously motivated members of the legislature in direct response to the leadership of religious sects; that the effectiveness of that reli-

gious leadership in the governmental sector would be greatly enhanced by the presence in the State's highest deliberative bodies of ministers and priests. The present day religious wars in Ireland and Lebanon, that shock the conscience of all men of good will, everywhere, religious and non-religious, remind us that the human race has not advanced to a degree of civilization that will permit us to conclude that the fervor of religion will never again disturb and disrupt secular affairs and government. Out of its proper realm it is a force of awesome power and influence upon human conduct.

The later case of *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), is similar in some respects to *Braunfeld,* and a different result was reached. However, the distinctions are clear and apparently represents no erosion of the *Braunfeld* decision.

In *Sherbert* appellant's religion prohibited Saturday labor. The textile mill where she had worked five days a week for two years, changed all three shifts to a six day week. She was unable to find other employment, because of her unwillingness to depart from a basic tenet of the Seventh Day Adventist creed. Her application for unemployment compensation benefits was denied on the grounds that she had failed without good cause to accept suitable work. That ruling was sustained by the courts of South Carolina and reversed by the Supreme Court. The effect of South Carolina's action was analyzed as follows:

"For '[i]f the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect.' *Braunfeld v. Brown,* supra, 366 U.S., at 607, 81 S.Ct., at 1148. Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following

the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." 374 U.S. at 404, 83 S.Ct. at 1794.

No compelling state interest to justify the infringement upon appellant's First Amendment right was asserted and proven to exist. The possibility that fraudulent claims by insincere claimants would dilute the fund and hinder scheduling by employers of necessary Saturday work was rejected, having been asserted for the first time in the Supreme Court and there being no supportive evidence in the record. The Court also expressed doubt that these asserted interests could be shown to be sufficiently compelling to justify a First Amendment infringement.

The Court distinguishing *Sherbert* from *Braunfeld*, said:

"In these respects, then, the state interest asserted in the present case is wholly dissimilar to the interests which were found to justify the less direct burden upon religious practices in *Braunfeld v. Brown*, supra. The Court recognized that the Sunday closing law which that decision sustained undoubtedly served 'to make the practice of [the Orthodox Jewish merchants'] religious beliefs more expensive,' 366 U.S., at 605, 81 S.Ct., at 1147. But the statute was nevertheless saved by a countervailing factor which finds no equivalent in the instant case—a strong state interest in providing one uniform day of rest for all workers." 374 U.S. at 408, 83 S.Ct. at 1796.

■ Appellee insists that his free exercise claim is closely akin to the question presented in *Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961). Torcaso was refused a commission as notary public because he would not declare his belief in God. The Maryland Constitution provided that no religious test be required for any office, except a declaration of belief in the existence of God. The Court said that the test oath is abhorrent to our tradition and that neither a state nor the Federal Government can constitutionally force a person "to profess a belief or disbelief in any religion." In our opinion, Article IX, Section 1 does not have the effect of forcing ministers and priests to profess a belief or disbelief in any religion. The test oath clearly intruded upon the freedom to believe or to disbelieve, and no state interest to justify its imposition was, or could be asserted.

Appellee also relies upon *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and *West Virginia State Board of Education v. Barnette*, supra footnote 3, as involving constitutionally protected religious belief and action, comparable with his situation. In both cases the Supreme Court invalidated state action requirements that directly interfered with religious beliefs. In our opinion, the cases are inapposite.

■ We conclude that Article IX, Section 1, Constitution of Tennessee, does not infringe upon religious belief or religious action within the protection of the free exercise clause; that such indirect burden as may be imposed upon ministers and priests by excluding them from the lawmaking process of government is justified by the compelling state interest in maintaining the wall of separation between church and state.

### III.

■ Appellee argues that Article IX, Section 1 amounts to an establishment of religion, in violation of the First and Fourteenth Amendments of the United States Constitution. This argument is predicated on the assumption that the provision applies only to ministers and priests of the Christian faith; that it was originally intended as a preference or benefit protecting them from diversion from the "great duties" of the pastoral function.

We disagree with that interpretation.

The word "priest" is defined in Webster's Third New International Dictionary, pp. 1799–1800 (1971) as: "1: one who performs sacrificial, ritualistic, mediatorial, interpretative, or ministerial functions esp. as an authorized or ordained religious functionary or official minister of a particular religion."; and in the American Heritage Dictionary Of The English Language, p. 1039 (1970) as: "2. A minister in a non-Christian religion. 3. One whose role is considered comparable to that of a priest."

We hold that the phrase ". . . priests of any denomination whatever" is intended to embrace the counterparts of ministers, priests and rabbis in every religious sect, whatever may be their title or designation.

The disposition we make of appellee's establishment clause contention also disposes of his assertion that Article IX, Section 1 is unconstitutionally vague.

## IV.

Appellee's last federal constitutional contention is that Article IX, Section 1 amounts to state discrimination against himself and other ministers who wish to serve as delegates to the 1977 Constitutional Convention. We again disagree. The equal protection clause does not strike down every difference in the application of laws but rather is concerned with "invidious distinctions." *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). We do not find that the disqualification of ministers from seats in the Legislature amounts to such a distinction. .

The United States Supreme Court has created two (2) tests for normally determining whether or not a particular state action violates the equal protection clause. In order to determine which test to apply the Court looks at: "the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in sup-

port of the classification." *Dunn v. Blumstein,* 405 U.S. 330, 335, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972). If a state law or action makes a classification that infringes on a "constitutionally protected right" it must show a "compelling state interest" for that classification or it is unconstitutional. *Id.* at 339, 92 S.Ct. 995. However, if a non-fundamental right is in question, the state need only demonstrate that the classification is reasonably related to a permissible state interest. *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Both parties rely on these tests in their opposing positions on the constitutionality of Article IX, Section 1. But, in *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) the Supreme Court has articulated a third test that we believe to be applicable here. The Court was faced with which standard should be applied to a state filing fee which could prevent poor persons from holding public office. The Court determined that a test more rigid than merely "a rational basis" but not seemingly as strict as requiring "a compelling state interest" should be applied. Chief Justice Burger spelled out the test that would be employed to evaluate classifications that infringed on the right to seek and hold public office:

". . . the laws must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster." 405 U.S. at 144, 92 S.Ct. at 856.

Our examination of both Article IX, Section 1 and its legislative history reveals that the state's objective was and always has been to insure separation of church and state. While we are of the opinion that a compelling state interest undergirds Article IX, Section 1, the legitimacy of its objective is beyond question. We reject the contention that the subject article violates the equal protection clause of the Fourteenth Amendment.

## V.

Although the disposition we make of this case does not require that we address appel-

lant's second assignment of error, we deem it appropriate to do so, because of its relevance if the ultimate result is contra.

The learned Chancellor decreed:

"That the portion of Section 4 of Chapter 848 of the Public Acts of Tennessee, 1976, which reads, '. . . who can qualify for membership in the House of Representatives of the General Assembly . . .', be and it hereby is declared to be in violation of the requirements of the First Amendment of the Federal Constitution.

That the requirements for the office of delegate to the 1977 Tennessee Constitutional Convention be and they hereby are declared to be determined by the general statutes on qualifications for office-holders, as set forth in the Code of Tennessee."

█ Appellant asserts that if Article IX, Section 1 is unconstitutional the remaining qualifications and disqualifications for membership in the House of Representatives of the General Assembly of Tennessee should control rather than the general statutes on qualifications for state offices. We also sustain appellant's second assignment of error.

There are significant distinctions between the qualifications for membership in the House of Representatives and those prescribed in the general statutes applicable to offices under the authority of this State, not otherwise specifically provided.[4]

Section 11 of Chapter 848, Public Acts of 1976 is an all inclusive rescue or savings clause. No extensive analysis is required of the doctrine of elision as applied in this State to support our conclusion that if the unconstitutionality of Article IX, Section 1 be conceded, that single disqualification should be elided and the remaining qualifications and disqualifications for membership in the House of Representatives govern the eligibility of delegates to the 1977 limited constitutional convention. *See, Carr v.*

*State ex rel. Armour,* 196 Tenn. 256, 265 S.W.2d 556 (1954), *Davidson County v. Elrod,* 191 Tenn. 109, 232 S.W.2d 1 (1950); and *State v. Dunn,* 496 S.W.2d 480 (Tenn. 1973).

## VI.

Reverend McDaniel filed a counter-complaint, cross-complaint and third party complaint on October 21, 1976, following this Court's remand of the first appeal. The action was brought on behalf of himself and all other ministers of the gospel, all priests of any denomination whatever, present and future, (1) who wish to seek election as delegates to the 1977 constitutional convention or any future constitutional convention and (2) who wish to seek election as members of either body of the General Assembly of this State; and as a class action on behalf of himself and all independent voters who (1) wish to vote for delegates to the 1977 limited constitutional convention and all future constitutional conventions, (2) who wish to vote for candidates for election as members of the House or Senate and (3) who wish to vote for ministers of the gospel or priests of any denomination whatever in the November 2, 1976, election or any future election to a constitutional convention or to both bodies of the General Assembly of this State.

The Chancellor, having declared Article IX, Section 1 unconstitutional, granted the relief sought by Reverend McDaniel and all persons similarly situated composing the class of ministers of the gospel and priests of any denomination whatever who are candidates to serve as delegates to the 1977 limited constitutional convention and denied all other relief sought.

Reverend McDaniel appeals from the failure to grant relief to the other classes of persons described above.

█ We overrule all of the assignments of error relied upon by Reverend McDaniel. The Chancellor correctly held in his memo-

---

**4.** *See,* Tennessee Constitution Article 2, §§ 9, 10, 25 and 26; Article 6, § 7; Article 9, § 1, Article 10, § 3 and T.C.A. §§ 8–1801, 1803; § 39–3219 and § 40–2714.

·randum opinion that the issues raised on behalf of said classes do not present justiciable controversies under the declaratory judgment statute because they are abstract, theoretical and based upon contingencies which may not arise. *Story v. Walker,* 218 Tenn. ·605, 404 S.W.2d 803 (1966).

We hold that Article IX, Section 1, Constitution of Tennessee is free of Federal Constitutional infirmities. The result is that appellee, Reverend Paul McDaniel, a minister of the gospel, is ineligible to serve as delegate to the 1977 limited constitutional convention. He was the successful candidate in the November 2, 1976, election for delegate from the 29th District, Hamilton County, Tennessee. Section 6, Chapter 848, Public Acts of 1976 provides that any vacancy in the membership of the convention from any representative district shall be filled by election of a qualified delegate by the legislative body of the county of residence of the delegate whose seat becomes vacant.

The judgment of the Chancery Court of Hamilton County, Tennessee, is reversed. The clerk of this Court will issue an order certifying to the Governor, the Secretary of State, and the legislative body of Hamilton County that a vacancy exists in the 29th House District, Hamilton County, by virtue of Reverend Paul McDaniel's ineligibility. Costs are adjudged against appellee.

COOPER, C. J., and HENRY and HARBISON, JJ., concur.

BROCK, J., dissents (see separate opinion).

BROCK, Justice, dissenting.

I dissent from the decision and opinion of the majority.

In my opinion, Chapter 848, Public Acts of 1976,[1] insofar as it declares ministers of the gospel and priests of any denomination ineligible to serve as delegates to the Constitutional Convention of 1977, is violative of the (1) "free exercise" guaranties of the First Amendment to the Constitution of the United States [2] and Article 1, Sec. 3, Constitution of Tennessee and (2) the equal protection clause of the Fourteenth Amendment to the Constitution of the United States.

I cannot agree with the conclusion of the majority that ". . . the subject provision simply does not impose any burden, direct or indirect upon religious belief or religious action." It is my view that the statute does, indeed, substantially and directly prohibit the free exercise of religion by the appellee and that no reason, consistent with the First Amendment, can be advanced to justify the prohibition.

The statute clearly prohibits a minister, who is otherwise qualified, from serving as a delegate in the Constitutional Convention of 1977. Thus, the appellee, who desires to be both a minister and a delegate, must purchase the right to be a delegate by giving up his right to continue to be a minister. The disqualification imposed upon the appellee is as much a burden, a penalty, as would be a fine or imprisonment imposed upon him for being a minister. It forces the appellee to make a choice between his right to be a minister and his right to participate in his state government as a delegate to the Constitutional Convention, both of which rights are, in my opinion, guaranteed by the First and Fourteenth Amendments. Thus, the statute confronts the appellee with the necessity of making the kind of choice which the Supreme Court held to be impermissible in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In that case the South Carolina statute forced the citizen to choose between her right to receive unemployment benefits

1. The majority opinion speaks, throughout, as if we were determining the validity under the U.S. Constitution of Art. IX, Sec. 1, Constitution of Tennessee. For the sake of clarity, I will speak only in terms of the statute before us.

2. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . .."

and her right to practice her religion by keeping Saturday as the Sabbath. Pertinent here is the following statement of the Court:

"The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Government imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." 374 U.S. at 404, 83 S.Ct. at 1794.

But, does being a minister constitute an exercise of religion protected by the First Amendment? I should have thought that there could be no question that it does. However, the majority dispute that conclusion. It is not denied that one who performs the customary functions of a minister is exercising his religion, but it is asserted that one dedicated to such service may, because of that dedication, be barred from serving as a constitutional convention delegate, as a necessary means of maintaining "the separation of Church and State."

Such necessity is not evident to me. The national government and the 49 other states get along very well without such a disqualification of ministers. The First Amendment merely prohibits *laws* respecting the establishment of religion by government and *laws* which would prohibit the free exercise of religion; it does not require the "separation of Church and State" in all other respects. *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952). Particularly, it does not, in my view, prohibit a religious leader from participating in his government upon the same terms as other citizens, nor a government official from taking an active, even a leadership, role in a religious organization.

I think that the majority has misinterpreted and misapplied the decision in *Everson v. Board of Education of Ewing Tp.,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). I have no quarrel with the quotation from that opinion that:

"Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa." 330 U.S. at 16, 67 S.Ct. at 512.

However, I do not understand that statement to mean that an official of State or Federal government, in his capacity as a private citizen, is prohibited from participating in religious affairs or that a member or leader of a religious organization is forbidden from participating, as a private citizen, in his State or Federal government. To the best of my knowledge, the decision of the Court today is the first to hold to the contrary.

No doubt, Tennessee is free to go further in its efforts to insure "the separation of Church and State" than the First Amendment has gone; but, clearly it is circumscribed in that endeavor by the strictures of the First and Fourteenth Amendments. These Amendments require that a law which would restrict, diminish or burden the right to freely exercise one's religion can be justified only by "the gravest abuses, endangering paramount interests." *Sherbert v. Verner, supra,* 374 U.S. at 406, 83 S.Ct. at 1795; *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945).

In my view, the majority opinion advances no such justification for this statute. I find no weight in the argument that ministers, as candidates and as delegates, would have an undue advantage over other candidates and delegates, but, even if this were true, it is an advantage which the State has no compelling interest in preventing.

Nor do I agree that the disqualification imposed by this statute is a necessary means of maintaining permissible "separation of Church and State," of preventing "an establishment of religion." If the appellee should persuade a majority of his fellow delegates to propose an amendment to the Constitution which would infringe upon religious liberty and if the electorate of the state should ratify such amendment, still the courts of this state and the federal

courts would stand ready, willing and able to strike it down before any harm could occur.

Finally, the fear that religious strife would be fomented by the candidacy of ministers is equally unpersuasive. I am not aware of any basis for such a fear.

The same lack of necessity for this statute as a means of protecting a paramount or compelling state interest which causes it to fail when tested by the First Amendment likewise compels the conclusion that it invidiously discriminates against ministers and, thus, violates appellee's right to equal protection of the law under the Fourteenth Amendment. See *In Re Summers*, 325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795 (1945); *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). No excuse, other than those hereinabove found to be wanting, is offered for denying to ministers the right to serve as delegates to the Constitutional Convention of 1977.

I would hold that this statute fails to pass muster under both the First and Fourteenth Amendments and affirm the decree of the Chancellor.

