Argued and submitted September 28, 1981, reversed and remanded with instructions February 16, Employment Division's reconsideration denied April 29, Salem Academy's reconsideration denied July 15, Employment Division's petition for review allowed July 6, 1983 (295 Or 297), Salem Academy's petition for review denied August 16, 1983 (295 Or 541)

# SALEM COLLEGE & ACADEMY, INC.,
*Petitioner,*

*v.*

# EMPLOYMENT DIVISION et al,
*Respondents.*

## (No. 80-T-56; CA A20465)

Paul M. Fletcher, Salem, argued the cause and filed the brief for petitioner.

Jan Peter Londahl, Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were Dave Frohnmayer, Attorney General, Stanton F. Long, Deputy Attorney General, and William F. Gary, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warden and Warren, Judges.

BUTTLER, P. J.

### BUTTLER, P. J.

Petitioner seeks judicial review of the Employment Division referee's decision affirming the Division's tax assessment for reimbursement of unemployment compensation paid to four of its former employes. It contends that it is statutorily exempt from the Unemployment Compensation Act (ORS 657.005 to 657.990) or, if not exempt, that the application of the Act to it is forbidden by the First Amendment to the United States Constitution.[1] We conclude that petitioner is not exempt by statute, but that applying it to petitioner and not to church-related schools violates the Establishment Clause of the First Amendment. Given that conclusion, we need not decide whether, or to what extent, the Act may be applied to religious schools in light of the Free Exercise Clause of the First Amendment, or whether the Act denies petitioner equal protection under the Fourteenth Amendment.

Petitioner is an interdenominational Christian primary and secondary school founded in Salem in 1945 by the pastor and laymen of a local church. It is organized as a nonprofit corporation, registered with the Oregon Department of Education, exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code and governed by a 16-member Board of Trustees. It enrolls 750 students and employs approximately 50 teachers, in addition to administrative and staff personnel. Its expenses average approximately $1400 per student per year, revenues are derived from tuition and donations, and the average student tuition is $1,200 per year.

---

[1] The First Amendment to the United States Constitution provides, in relevant part:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * *."

Petitioner also asserts a violation of Article I, section 2, of the Oregon Constitution, which provides:

"All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences.—"

Article I, section 3, of the Oregon Constitution, provides:

"No law shall in any case whatever control the free exercise, and enjoyment of religeous [sic] opinions, or interfere with the rights of conscience.—"

In view of our conclusion with respect to the federal constitution, we need not, and do not, consider the Oregon Constitution.

One of petitioner's principals summarized the purpose of the school:

"[Its] purpose is to teach and train children and young people to a life of service to God. It makes no difference if that service is as a lawyer or a doctor or a plumber: the whole focus of living is to please God. And that is why we exist, to train every single child that they'll function in society, in their church, in their home in a way that honors God."

Specific religious training includes daily Bible study, prayer and twice-weekly chapel services. Moreover, petitioner's Parent and Student Handbook provides:

"The place of Christ is paramount in education, and should permeate every phase of the school - academics, athletics, activities, the lunchroom, playground, etc. Jesus Christ is not appendage to education, He is the center of it."

All staff, including maintenance personnel, school administrators, school store operator and teachers are presented to students as examples of faith-in-action and are expected to proclaim the teachings of Jesus Christ to the students. Teachers are selected on the basis of their ability to teach from "God's perspective" and are expected to exert a spiritual influence on the lives of their students. All teaching must accord with petitioner's doctrinal statement of faith, and the teaching of doctrine peculiar to any denomination is forbidden. Each teacher must be an active member of a local church. Each teacher is evaluated annually and is subject to dismissal if his or her performance does not meet petitioner's standards. In addition, all staff are subject to dismissal for failure to comply with petitioner's code of ethics. Among other things, the code requires that each staff member be a "regenerated person, who is confident of the leading of the Holy Spirit to the work here as his opportunity to make Christ known by life and word."

Petitioner is not affiliated with any specific church or denomination and is open to students of all denominations. Approximately 60 to 80 local churches participate in petitioner's activities. In selecting board members, petitioner attempts to have a fair representation of the churches that send it students. Petitioner's personnel serve

as substitute pastors, and the local clergy serve as substitute teachers and speak at chapel services. The local churches encourage enrollment in the school and contribute funds or encourage their members to do so. Petitioner could not survive if it lost the support of the major churches in Salem's evangelical community.

## THE STATUTORY SCHEME

The Federal Unemployment Tax Act (FUTA), 26 USC §§ 3301-3311 (1976 ed. & Supp. IV), created a cooperative federal-state scheme to provide benefits to unemployed workers. It requires employers to pay an excise tax on wages paid to employes in covered employment but entitles employers to a credit of up to 90 percent of the tax for contributions they have paid into state unemployment programs that comply with federal standards. 26 USC §§ 3301-3302. In addition, federal grants are available to the states to administer federally approved state plans. *See* 29 USC § 49d(b); 42 USC § 501. One of the requirements for federal approval is that state programs encompass certain broad categories of employment. *See* 26 USC §§ 3304 and 3309. The Secretary of Labor annually reviews each state program to determine whether it satisfies federal standards. 26 USC § 3304(a) and (c). Because of this combination of federal grants and tax credits, the federal government, for all practical purposes, dictates the minimum coverage of state unemployment insurance laws. The Oregon program is codified in ORS ch 657.

Until 1970, section 3306(c)(8) of FUTA excluded from covered employment "service performed in the employ of a religious, charitable, educational, or other [tax exempt] organization." Pub. L. No. 86-778, § 533, 74 Stat. 984. In 1970, Congress amended FUTA to require state plans to cover employes of nonprofit organizations, state hospitals and state institutions of higher education, thus eliminating the broad exemption available to nonprofit organizations. 26 USC § 3309(a)(1). In its place, Congress enacted section 3309(b) to exempt from mandatory state coverage a more narrow class of religious and educational employes, under which "employment" did not include service performed:

"(1)  in the employ of (A) a church or convention or association of churches, or (B) an organization which is

operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches;

"(2) by a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order;

"(3) in the employ of a school which is not an institution of higher education. * * *" Pub. L. No. 91-373, § 104(b)(1), 84 Stat. 698.

In 1976, Congress again amended FUTA, eliminating the substance of section 3309(b)(3), and thereby removing the blanket exemption for school employes. *See* Unemployment Compensation Amendments of 1976, Pub. L. No. 94-566, § 115(b)(1), 90 Stat. 2670. In order to maintain compliance with FUTA, Oregon promptly amended the state statute. Or Laws 1977, ch 446, § 4.

For purposes of this appeal, there are three principal consequences to a covered employer. First, the employer is subject to financial liability as determined by either the periodic tax payment or the reimbursement method. Under the periodic tax payment method, required of most employers, the employer makes periodic tax payments into the state unemployment compensation fund; each employer's contribution rate is determined by the Employment Division based on the amount of benefits previously paid to former employes of that employer. 26 USC § 3301(a)(c); ORS 657.430 to 657.471. Nonprofit organizations, however, are permitted to elect the reimbursement method for determining tax liability, ORS 657.505(8), under which the employer is required to pay only the exact amount paid from the fund to the unemployed former employes of that employer. In contrast to the standard method, payments under the election provision are, in effect, reimbursements made after the benefit has been paid. Electing employers are required to file a surety bond or deposit other security with the Employment Division. ORS 657.505(8).

The second major consequence of coverage is that employers are required to maintain and submit to the Employment Division detailed employment records, which

include the wages paid to each employe and other information necessary to compute the employer's tax liability. ORS 657.660; 657.662. Third, the Employment Division must analyze the reasons for the termination of employment for workers of covered employers in order to determine the employers' liability. In general, if the employe is terminated for "misconduct connected with work" as determined by the Division, subject to judicial review, the employer is not liable. See ORS 657.176(2).

The present case arose when the Employment Division sent petitioner a notice of tax assessment seeking reimbursement for benefits paid during the first quarter of 1980 to four former employes;[2] petitioner had previously elected the reimbursement method after being notified by the Division that it was subject to the Act. Petitioner requested a hearing pursuant to ORS 657.683, contending that it was "an exempted religious institution."

. At the hearing, petitioner contended that it comes within the statutory exemption of ORS 657.072(1), which provides:

" 'Employment' does not include service performed:

"(a) In the employ of:

"(A) A church or convention or association of churches;

"(B) An organization which is operated primarily for religious purposes and which is operated, supervised, controlled or principally supported by a church or convention or association of churches;

"* * * * *."

In the alternative, petitioner contended that the statute is unconstitutional as applied to it. The referee determined that petitioner is not a "church" and that, although it is

[2] V.M. Tadina drove a school bus for three weeks before resigning to take other employment. D.L. Spatz served as a substitute teacher for five hours. B.A. Forester was a maintenance man for one month, before being discharged for inadequate performance and overreacting to student behavior. W.W. Wilder was a maintenance man and bus driver for one month. He was discharged for improper personal conduct and inadequate performance. Each of the four claimants left the school, found other employment and then filed benefit claims after leaving their subsequent employment. In each instance, the school was notified of the pending claim, but as a base year-reimbursing employer, it was not entitled to any relief. See ORS 657.504.

operated primarily for religious purposes, it does not satisfy the requirement that it be "operated, supervised, controlled or principally supported by a church or convention or association of churches." The referee did not decide petitioner's constitutional arguments. Petitioner seeks judicial review ·pursuant to ORS 183.480 and 183.482.

At the time this case was argued, the parties advised the court that *California v. Grace Brethren Church,* 457 US 393, 102 S Ct 2498, 73 L Ed 2d 93 (1982), was then pending on appeal in the United States Supreme Court and that the decision in that case would dispose of the issues presented here. At their request, we deferred disposition to abide the anticipated decision. As pointed out below, the Supreme Court dismissed the proceedings without reaching the merits.

### SCOPE OF ORS 657.072(1)(a)

■    Petitioner contends that it is exempt under the statute, because it is a "church" and because it is principally supported by an association of churches in that it could not survive without the moral support of the local evangelical churches. Petitioner's first argument is without merit. *Grace Brethren Church v. California,* (CD Cal 1981) (reported in CCH, Unemployment Insurance Reports, §§ 21643 and 21644), *vacated on jurisdictional grounds, California v. Grace Brethren Church, supra.* Its second argument is more substantial, however.

We note at the outset that it is undisputed that the Oregon unemployment compensation plan is intended to be co-extensive with FUTA. Thus, although technically petitioner is challenging ORS 657.072(1)(a), our interpretation of that statute, as well as our conclusion as to its constitutionality, necessarily applies to FUTA also. *See California v. Grace Brethren Church, supra,* 457 US at 397; *St. Martin Evangelical Lutheran Church v. South Dakota,* 451 US 772, 780 n 9, 101 S Ct 2142, 68 L Ed 2d 612 (1981).

Petitioner argues that congressional legislative history demonstrates that an increase in unemployment among *public school* teachers in the early 1970's and requests from the National Education Association provided the impetus for Congress to amend section 3309 of FUTA.

In addition, petitioner points out that the Supreme Court has observed that Congress did not discuss churches or church schools, but was concerned solely with secular educational institutions, particularly the public schools, in eliminating section 3309(b)(3). *St. Martin Evangelical Lutheran Church v. South Dakota, supra,* 451 US at 785-86. Because of that history and the policy of construing statutes to avoid serious constitutional questions, *NLRB v. Catholic Bishop of Chicago,* 440 US 490, 500-01, 99 S Ct 1313, 59 L Ed 2d 533 (1979), petitioner argues that the phrase "principally supported" is not limited to financial support, but includes continuing *moral* support of local churches to independent religious schools that depend on such support for their existence. Whatever merit there may be to that argument, we think that the Supreme Court's treatment of this question in *California v. Grace Brethren Church, supra,* although summary, indicates that it does not so construe the exemption.

Following the 1976 amendments to FUTA, the Secretary of Labor took the position that church-related elementary and secondary schools were covered by the Act. In *Grace Brethren Church v. California, supra,* a group of California religious schools challenged that interpretation in federal district court. For purposes of the statutory and constitutional arguments, the district court divided the plaintiff schools into three classes: Category I included schools that are part of the corporate structure of a church or association of churches; Category II included schools that are separate corporations formed by a church or association of churches; and Category III included schools that are "operated primarily for religious purposes, but which [are] not operated, supervised, controlled or principally supported by a church or convention or association of churches, i.e., an independent, non-church affiliated religious school." The court concluded that Category I and II, but not Category III, schools are exempt from coverage under section 3309(b) and that FUTA is unconstitutional as applied to Category III schools. The court enjoined the state from collecting unemployment compensation taxes from all of the schools.

After issuance of the court's injunction, the Supreme Court decided *St. Martin Evangelical Lutheran*

*Church v. South Dakota, supra,* holding that section 3309(b)(1)(A) exempts Category I schools from mandatory coverage under the state unemployment insurance programs and indicating that Category II schools are exempt as well. As a result, the state and federal defendants in *Grace Brethren* appealed the district court's order only as to Category III schools. As indicated above, the Supreme Court did not reach the substantive questions, because it held that the Tax Injunction Act, 28 USC § 1341, deprived the district court of jurisdiction to issue a declaratory judgment as well as an injunction. In the process of determining its own jurisdiction on appeal, 28 USC § 1252, however, the Court stated that there is no statutory exemption for "Category III" schools. *California v. Grace Brethren Church, supra,* 457 US at 408 n 18. Although that statement *may be* dicta, we believe it is the correct interpretation of ORS 657.072(1)(a)(B). Moreover, there is no evidence here that there is any organized relationship among the supporting churches that would qualify them as a "convention or association of churches" within the meaning of the statute.[3] Therefore, ORS 657.072(1) does not exempt petitioner from coverage.

## ESTABLISHMENT CLAUSE

Petitioner contends that, even if it is not exempt under ORS 657.072(1), the Act may not exempt church-affiliated but not independent religious schools without violating the Establishment Clause.

On the question of discrimination among religions, there is little direct precedent. Establishment Clause cases generally have focused on two issues: the intrusion of religious matter into government activities, particularly

---

[3] The district court's opinion in *Grace Brethren* discussed only whether Category III schools are "churches" within the meaning of the statute, and did not discuss whether those schools depended on local churches to provide them with students. Nevertheless, the Supreme Court stated flatly that independent, non-church-affiliated schools were not statutorily exempt, and it is difficult to imagine an independent religious school that does not depend on local churches to refer students and provide moral support. We do not believe that that kind of support, without more, fulfills the statutory requirement that petitioner be "principally supported" by a convention or association of churches. Moreover, the requirement of a "convention or association of churches" strongly suggests some organizational form, however informal, connecting the churches with each other. Petitioner offered no evidence or argument as to any relationship *among* its supporting churches.

religious exercises in public schools, *see, e.g., Engel v. Vitale,* 370 US 421, 82 S Ct 1261, 8 L Ed 2d 601 (1962), and government aid to religious organizations, particularly financial aid to parochial schools, *see, e.g., Walz v. Tax Commission,* 397 US 664, 90 S Ct 1409, 25 L Ed 2d 697 (1970). It has been generally understood that government may neither prefer nor disfavor any one religion or group of religions. *Everson v. Board of Education,* 330 US 1, 67 S Ct 504, 91 L Ed 711 (1947).

James Madison, one of the authors of the First Amendment, *Engel v. Vitale, supra,* 370 US at 436, stated that the policy of the country ought to be to promote a "multiplicity of sects" and that the First Amendment was designed to accomplish that end.[4] *Larson v. Valente,* 456 US 228, 102 S Ct 1673, 72 L Ed 2d 33, 48 (1982). Denying support for established churches does so by assuring that new, developing religions are, so far as government is concerned, at no competitive disadvantage and that the growth and advancement of a particular sect comes solely from the voluntary support of its membership. *See Zorach v. Clauson,* 343 US 306, 313-14, 72 S Ct 679, 96 L Ed 954 (1952) ("the government must be neutral when it comes to competition between sects"). In this respect, all groups of citizens are on equal footing in developing their own unique set of beliefs. Thus, *Larson v. Valente, supra,* struck down a statute imposing certain registration and reporting requirements on only those religious organizations that solicit more than 50 percent of their funds from non-members, because it discriminated between well-established churches and churches which are new and lack a constituency.

Presumably in recognition that the institutional form that a religion takes is essentially a religious question answered by each sect according to its beliefs, the Court has also stated that "freedom to adhere to such a religious *organization* or *form of worship* as the individual may choose cannot be restricted by law." *Cantwell v. Connecticut,* 310 US US, 296, 303, 60 S Ct 900, 84 L Ed 1213 (1940)

---

[4] " 'In a free government,' Madison added, 'the security for civil rights must be the same as that for religious rights; it consists in the one case in the multiplicity of interests and in the other in the multiplicity of sects.' " Hunt, *James Madison and Religious Liberty,* 1 Am. Hist. Ass'n Ann. Rep. 165, 170 (1961).

(emphasis supplied); *see also Jones v. Wolf,* 443 US, 595, 603, 99 S Ct 3020, 61 L Ed 2d 775 (1979). Although the Court has not elaborated on what constitutes the "organization or form of worship," it has stated that a broad interpretation of what constitutes a religious belief is necessary in order to avoid discriminating among faiths, *McGowan v. Maryland,* 366 US 420, 442, 81 S Ct 1101, 6 L Ed 2d 393 (1961), and has consistently applied a very broad interpretation in deciding cases. *See, e.g., Torasco v. Watkins,* 367 US 488, 490, 495, 81 S Ct 1680, 6 L Ed 2d 982 (1961) (voiding Maryland's requirement that all state officeholders declare their belief in the existence in God, noting, among other infirmities, that the requirement disfavored religions that either prohibit the declaration or do not teach the existence of God); *United States v. Seeger,* 380 US 163, 165-66, 175, 85 S Ct 850, 13 L Ed 2d 733 (1965) (Congress used the expression "Supreme Being" in a statutory requirement for exemption from military service in order to avoid "picking and choosing religious beliefs"; the test, therefore, is whether "a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God"); *Welsh v. United States,* 398 US 333, 340-41, 90 S Ct 1792, 26 L Ed 2d 308 (1970) (statutory requirement that a putative conscientious objector be opposed "by reason of religious training and belief" embraces an individual whose beliefs are "purely ethical or moral in source" and which were formed "by reading in the fields of history and sociology").[5] We

---

[5] In his concurring opinion in *Welsh,* Justice Harlan recanted his position in *Seeger* as to the construction of the statute, but stated that Seeger, nevertheless, had been entitled to an exemption, because the classification offended the Establishment Clause. 398 US at 356. More recently, in a concurring opinion in *McDaniel v. Paty,* 435 US 618, 632 n 4, 98 S Ct 1322, 55 L Ed 2d 593 (1978), in which the plurality held that the Free Exercise Clause was violated by a statute barring "Minister[s] of the Gospel, or priest[s] of any denomination whatever" from serving as delegates at the state's limited constitutional convention, Justice Brennan stated that the statute might also

"* * * discriminate among religions by depriving ministers of faiths with established, clearly recognizable ministries from holding elective office, while permitting the members of nonorthodox humanistic faiths having no 'counterpart' to ministers, 547 SW2d 897, 908 (1977), similarly engaged to do so. Madison warned that disqualification provisions would have precisely such an effect:

" '[D]oes it not in fine violate impartiality by shutting the door [against] the Ministers of one Religion and leaving it open for those of every other.' 5 Writings of James Madison 288 (G Hunt ed 1904)."

believe that a broad view of what is a "form of worship" is also necessary to avoid discriminating among faiths. There can be little doubt, for example, that a grant of tax relief limited to churches whose organizational structure conformed to hierarchical principles of polity would constitute the establishment of religion in that favoring one form of polity establishes the doctrines on which it rests.[6]

■ With these principles in mind, we believe that ORS 657.072(1) improperly favors one organizational form of religious expression, *i.e.,* schools linked to an established church. Operation of parochial schools has been recognized as an "integral part" of the perceived religious mission of a particular faith, *Lemon v. Kurtzman, supra,* 403 US at 616; and it has been held that parents have a Free Exercise right to choose a religious education for their child. *Wisconsin v. Yoder, supra.* First Amendment protection of religious schools derives primarily from their function, however, not their connection to a church. *NLRB v. Bishop Ford Cent. Catholic High School,* 623 F2d 818, 823 (2d Cir), *cert den* 450 US 996 (1980) ("It is the suffusion of religion into the curriculum * * * which create[s] the conflict with the Religion Clauses and not the vesting of legal title or the responsibility of operation."); *accord Cantwell v. Connecticut, supra,* 310 US at 306; *Christofferson v. Church of Scientology,* 57 Or App 203, 241-42, 644 P2d 577 (1982) (church is subject to the civil law of fraud for statements which are made for a wholly secular purpose). Petitioner's dominant purpose is teaching its interpretation of Christian faith; that is a protected form of religious exercise and expression.

It hardly needs to be said that there are vast differences in Biblical interpretations among Christian sects. Although petitioner depends on 60 to 80 Salem churches for support, the doctrine it teaches may not be coextensive with that of each of the churches. By maintaining its independence, which petitioner's administrator

---

[6] Some religious sects emphasize an extremely individualistic nature of religion and reject creeds, dogmas and hierarchies — in short, all elements that tend to make the practice of religion uniform for all believers. These beliefs lead to congregational principles of polity and to the view that "any group of like-minded and professed believers have *[sic]* the right to organize themselves into a church." Speery, *Religion in America* 9 (1945).

testified it wishes to do, petitioner, through its governing body, can develop and change its doctrine as it sees fit, without regard to whether any of its supporting churches disapprove. That is its right. By requiring a school to submit to the control of a church or affiliation of churches to receive the exemption, ORS 657.072 effectively grants the church the power to determine the school's doctrine, thereby infringing on the right of citizens to develop, independently, their own set of beliefs as well as discouraging the multiplicity of sects. That the legislature cannot do. For First Amendment purposes, this school is indistinguishable from church-affiliated schools; the exemption cannot be conditioned on whether a school whose primary purpose is religious — under the statute, that must be determined as to all — is linked with a church. *See Christian School Ass'n v. Com. Dept. of Labor,* 55 Pa Commw Ct 555, 423 A2d 1340, 1346-47 (1980).

## REMEDY

Finally, we must determine the most appropriate remedy to cure the constitutional violation. Petitioner assumes, without discussion or citation of authority, that it must be granted an exemption if the classification is unconstitutional. The state declares, citing only dicta from the decision of a federal district court, that if the classification is unconstitutional the exemption must be struck down and all religious schools must be brought under the Act. The preferred solution is to effectuate the intention of the legislature. *See Hewitt v. SAIF,* 294 Or 33, 51, 653 P2d 970 (1982). That approach is complicated here, however, by the federal-state relationship created by FUTA.

To expand the exemption to include petitioner would result in Oregon's program providing less coverage than is required by FUTA, as interpreted by the Secretary of Labor. As discussed above, the Secretary is empowered to decertify such a program and there appears to be a substantial risk that he would do so. In *California v. Grace Brethren Church, supra,* the Secretary appealed the injunction prohibiting him from conditioning his approval of the California unemployment insurance program on its coverage of Category III schools. If he were to succeed, even temporarily, in decertifying the state's program, the consequence would be a substantial disruption for the state: not

only would the state be ineligible for a federal grant to administer its program, but no Oregon employers subject to the Act would receive credit against the federal tax for contributions to the state program.

The alternative remedy of subjecting all church schools to the Act is contrary to the language of ORS 657.072(1). However, it is clear that the legislature has intended to conform Oregon's statutory scheme to FUTA. ORS 657.030(2)(b)[7] expressly so provides. We do not know whether the Secretary of Labor will persist in his interpretation of the exemptions from FUTA involved here until the United States Supreme Court resolves the constitutional questions. Neither do we know how the Supreme Court would decide those questions nor how Congress might respond to a decision that the provision is unconstitutional under the Establishment Clause. It seems reasonably clear, however, that Congress intended to exempt church-operated schools and, accordingly, would probably expand the exemption to include religious schools like petitioner's.

■ Those considerations lead us to conclude that independent religious schools must be exempt from the Act.[8] Accordingly, the referee's decision affirming the Employment Division tax assessment to petitioner is reversed, and the case is remanded with instructions to quash the Notice of Assessment, and for such further action as may be necessary and not inconsistent with this opinion.

---

[7] ORS 657.030(2)(b) provides:

"(2) Notwithstanding any other provisions of this chapter, 'employment' shall include service:

"* * * * *

"(b) Which is required to be covered under this chapter as a condition for employers to receive a full tax credit against the tax imposed by the Federal Unemployment Tax Act."

[8] To subject all religious schools might present additional constitutional problems under the Free Exercise Clause of the First Amendment.