IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 11, 2000 Session

# MARK A. MAYHEW, ET AL. v. JOHN WILDER, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 00C1833     Hamilton V. Gayden, Jr., Judge**

---

**No. M2000-01948-COA-R10-CV - Filed January 11, 2001**

---

WILLIAM C. KOCH, JR., J., concurring.

I concur with the court's conclusion that the members of the 101st General Assembly did not violate either Tenn. Const. art. I, § 19, Tenn. Const. art. II, § 22, or the Tennessee Open Meetings Act, Tenn. Code Ann. §§ 8-44-101, -108 (1993 & Supp. 2000), when certain committees and other groups of legislators held secret meetings during the 2000 legislative session to consider the state budget, the appropriations bill, and related revenue legislation. My purpose in filing this separate opinion is to emphasize three points. First, all departments of state government, including the Legislative Department, must adhere to the requirements of the Constitution of Tennessee. Second, even though the Judicial Department has the sole constitutional prerogative to adjudge the constitutionality of the conduct of the Legislative Department, the Judicial Department's power is itself circumscribed by the Constitution of Tennessee in order to maintain the proper separation of powers between the two departments. Third, our decision that the challenged meetings violated neither Tenn. Const. art. I, § 19, Tenn. Const. art. II, § 22, nor the Tennessee Open Meetings Act should not be misconstrued as an endorsement of the conduct at issue in this case.

## I.

The events that gave rise to this dispute are not uncommon. They are part of an annual, well-orchestrated process played out each spring in the Legislative Plaza and the State Capitol that culminates in the enactment of an appropriations bill containing the spending blueprint for state government for the ensuing fiscal year.[1] This process begins every year on February 1 when the Governor submits to the General Assembly a state budget[2] and the draft legislation needed to enact a balanced budget for the ensuing fiscal year. It ends when the General Assembly enacts an

---

[1] Tenn. Code Ann. § 9-1-101(a) (1999) provides that the fiscal year for state government begins on July 1 of each year and ends on the following June 30.

[2] The budget document includes proposed operating and capital expenditures for the next fiscal year, Tenn. Code Ann. § 9-4-5101(a), (b) (1999), and the revenue estimates for the same period. Tenn. Code Ann. §§ 9-4-5101(c), -5104.

appropriations bill and any other legislation necessary to generate the revenue needed for a balanced budget required by Tenn. Const. art. II, § 24.

Anyone even remotely familiar with this process understands full well that the General Assembly's public debates and the eventual adoption of an appropriations bill and accompanying revenue bills represent only the tip of the iceberg as far as the General Assembly's consideration of the State's annual fiscal blueprint is concerned. Much more activity occurs behind the scenes in the offices of power and in other hideaways in and around Nashville shielded from public scrutiny. For at least the last half of the twentieth century, legislative leaders, constitutional officers, administration representatives, and others have met behind closed doors to hammer out spending and revenue proposals that will please enough legislators to assure their passage. Rather than being open to all legislators, these meetings are open only to those who, by virtue of their position or influence, have become part of the inner circle.[3]

The news media covering the General Assembly have been aware of this process for years. While not approving of it, the capitol hill press corps has at least acquiesced in it. Some media representatives, while writing stories critical of the process, have attempted to best their colleagues by seeking copies of the Governor's budget or the results of the legislative leadership's budget discussions before their public release. This arrangement appeared to have been generally satisfactory to all participants – both the legislators and the news media – at least until the 101st General Assembly finally adjourned.

During its two-year life, the 101st General Assembly proved to be one of the most contentious legislative sessions in recent history. Controversy swirled from its opening in January 1999 after the Governor called for sweeping changes in the state tax system and presented a budget predicated on raising $365 million in new revenue. At the Governor's bidding, the General Assembly held a month-long special session during March and April 1999 to consider changing the state tax system but adjourned without acting. After reconvening in regular session, the General Assembly raised approximately $171.5 million in new consumer and business taxes, enacted an appropriations bill for the 1999-2000 fiscal year, and then adjourned on May 28, 1999.

The controversy over taxes and spending did not subside when the General Assembly adjourned. Bolstered by a legislative committee's conclusion that the state tax system was inadequate to fund the services needed to maintain Tennessee's economic vitality, the Governor called the General Assembly into a second special session to consider his proposal to reduce the state sales tax rate from 6% to 3.75%, to eliminate the 6% state sales tax on groceries, to revise the business tax structure, and to enact a flat 3.75% state income tax. This special session began on November 1, 1999, and ended abruptly on November 18, 1999. Despite a consensus that the state tax system should be restructured, vocal public opposition to a state income tax, political partisanship, and a dispute between the Senate and the House of Representatives forestalled any floor

---

[3]Senator Tim Burchett of Knoxville, referring to a meeting arranged for a select group of state senators to which he was not invited, observed: "I feel like Rudolph the red-nosed reindeer. I don't get to play any reindeer games." Bonna M. de la Cruz, *Business Tax Studied in Secret*, THE TENNESSEAN, May 24, 2000, at 1A.

votes on changes in the state tax system. Not long after adjournment of this session, the Governor threatened to call a third special session to complete work on restructuring the state tax system.

The second regular session of the 101st General Assembly convened on January 11, 2000. The Governor again placed restructuring the state's tax system on the legislative agenda by presenting a proposed budget for the 2000-2001 fiscal year that included $375 million in new revenue from a revised state tax system. The Governor's tax plan mirrored the plan he had submitted without success to the second special legislative session. More than the usual behind-the-scenes maneuvering occurred over the ensuing months as the legislative leadership and the Governor searched for common ground. Some of this maneuvering, according to the plaintiffs, occurred in secret meetings of legislative committees and other groups of legislators.[4] These efforts proved fruitless. Weighed down by the continuing vocal public opposition to a state income tax and the rancor remaining from the three unproductive legislative sessions in 1999, the General Assembly eventually abandoned its efforts to restructure the state tax system and enacted the appropriations bill for the 2000-2001 fiscal year. The appropriations bill balanced the state budget by raising the revenue estimates beyond the official estimates of the State Funding Board[5] and by using non-recurring revenues to fund recurring expenses. The Governor, calling the General Assembly's efforts a "Fudge-It Budget,"[6] vetoed the appropriations bill. The General Assembly lost no time overriding the Governor's veto and then adjourning sine die on June 28, 2000.

This lawsuit was filed in the Circuit Court for Davidson County two days after the 101st General Assembly adjourned. Complaining of the General Assembly's "habitual and willful resort to secrecy," an individual citizen, later joined by members of the print media and several of their professional associations, asserted that the General Assembly had violated Tenn. Const. art. I, § 19, Tenn. Const. art. II, § 22, and the Tennessee Open Meetings Act by "deliberately, repeatedly and flagrantly conducting secret, closed meetings of legislative committees." They also asserted that this conduct had "undermined public confidence in the fiscal and governmental soundness of the State of Tennessee." All of the plaintiffs requested declaratory relief. Some plaintiffs also demanded that the trial court invalidate the appropriations bill and any other revenue bills enacted in violation of

---

[4]We must construe the complaint in favor of the plaintiffs and accept all the allegations of fact as true because the State is appealing from the trial court's denial of its motion to dismiss. *Doe v. Sundquist*, 2 S.W.3d 919, 922 (Tenn. 1999); *Riggs v. Burson*, 941 S.W.2d 44, 47 (Tenn. 1997). The plaintiffs have alleged that throughout 2000, the House Democratic Caucus, the Senate Democratic Caucus, the Senate Finance Committee, the House Republican Caucus, the Joint Budget Conference Committee, and the leaders of the Senate and House of Representatives "deliberately, repeatedly and flagrantly" conducted "secret, closed meetings" to deliberate toward decisions and to make decisions regarding the revenue and budget bills that were enacted and took effect on July 1, 2000.

[5]Tenn. Code Ann. § 9-4-5202 (1999) requires the State Funding Board to provide the General Assembly and the Governor with periodic reports concerning the estimated rate of growth of the state's economy and the estimates of state tax and non-tax revenues.

[6]Bonna M. de la Cruz & Duren Cheek, *Lawmakers Approve a Budget; Sundquist Vows Veto*, THE TENNESSEAN, June 23, 2000, at 1A.

the Tennessee Open Meetings Act.[7]  Other plaintiffs insisted that the General Assembly should be required to report semi-annually to the courts on its compliance with the Tennessee Open Meetings Act.[8]

On behalf of all defendants,[9] the Attorney General and Reporter moved to dismiss the complaint on various procedural and substantive grounds, including lack of standing, legislative immunity, and failure to state a claim.  After the trial court denied the motion to dismiss and set the case for an expedited trial, we granted the Attorney General's Tenn. R. App. P. 10 application for an extraordinary appeal.  We took this step because the trial court's decision to conduct a trial and to appoint a constitutional law expert in accordance with Tenn. R. Evid. 702 & 706 departed from the accepted and usual course of judicial proceedings.  The pivotal questions in this case are issues of law that can be dealt with quite satisfactorily based on the record as it stands.

## II.
### SUBORDINATION OF THE GENERAL ASSEMBLY TO THE CONSTITUTION

The Constitution of Tennessee is the tangible product of our citizens' aspiration to live under the rule of law.  It provides evidence of the solemn transaction, unfolding ever since 1796, by which the governed confer power on the government to promote and protect their peace, safety, and happiness. Tenn. Const. art. I, § 1.  Thus, rather than being the source of the people's rights, the Constitution of Tennessee is the product of the exercise of the people's inherent power of self-government that pre-existed the Constitution itself.  *Cummings v. Beeler*, 189 Tenn. 151, 175-76, 223 S.W.2d 913, 923 (1949); *Stratton Claimants v. Morris Claimants*, 89 Tenn. 497, 512-13, 15 S.W. 87, 90 (1891); *Ridley v. Sherbrook*, 43 Tenn. (3 Cold.) 569, 574-75 (1866).

No department of state government transcends the Constitution of Tennessee.  Each department derives its power and authority from the Constitution and must, in turn, subordinate itself to the Constitution's requirements.  *Lynn v. Polk*, 76 Tenn. 121, 130 (1881) (Turney, J.).  Thus, unlike the British Parliament, our General Assembly's power is limited and restrained by the Constitution.  *Moore v. Love*, 171 Tenn. 682, 686-87, 107 S.W.2d 982, 983 (1937); *Louisville & Nashville R.R. v. County Court of Davidson*, 33 Tenn. (1 Sneed) 637, 670-71 (1854); *Smith v. Normant*, 13 Tenn. (5 Yer.) 271, 273 (1833).

---

[7]Tenn. Code Ann. § 8-44-105 states, in part, that any action taken at a meeting in violation of the Tennessee Open Meetings Act is void and of no effect.

[8]Tenn. Code Ann. § 8-44-106(d) requires government entities found to have violated the Tennessee Open Meetings Act to submit semi-annual written reports to the court regarding their compliance with the Act.

[9]The complaint names every member of the General Assembly as a defendant.  One legislator, Representative Robert W. Briley of Nashville, later sought to be "realigned" as a plaintiff.  The trial court initially granted Representative Briley's motion but later relegated him to the status of amicus curiae after striking him as a plaintiff and dismissing him as a defendant.  This decision has not been appealed.  Therefore, Representative Briley is the only member of the 101st General Assembly that is not a defendant in this suit.

Our decision that the General Assembly and its members did not violate Tenn. Const. art. I, § 19 or Tenn. Const. art. II, § 22 is based, not upon our conclusion that the General Assembly is somehow exempt from compliance with the Constitution, but rather upon our conclusion that the Constitution of Tennessee itself entrusts the General Assembly with the prerogative to work in secret whenever it decides to. While the plaintiffs are at liberty to assail the wisdom of the founders' decision to permit the General Assembly to work in secret, we are not.

### III.
### THE POWER OF THE COURTS TO REVIEW ACTS OF THE GENERAL ASSEMBLY

The Constitution of Tennessee protects the people's rights explicitly in Tenn. Const. art. I's Declaration of Rights and by providing other limitations and restrictions on the exercise of governmental power elsewhere in its text and structure. Among the most important of these restrictions is the allocation of governmental power to three separate departments of government – the executive, the legislative, and the judicial.[10] This separation of governmental power, required by Tenn. Const. art. II, §§ 1, 2, is intended to secure liberty by preventing the accumulation of excessive authority in a single department of government. *Mistretta v. United States*, 488 U.S. 361, 381, 109 S. Ct. 647, 660 (1989); THE FEDERALIST Nos. 47, 51 (James Madison) (Edward M. Earle ed., 1976); 1 CHARLES DE SECONDAT, BARON DE MONTESQUIEU, THE SPIRIT OF LAWS 163 (London, G. Bell & Sons, Ltd. 1914).

While the departments of government have been characterized as "independent" and "co-equal," *Summers v. Thompson*, 764 S.W.2d 182, 189 (Tenn. 1988); *Moore v. Love*, 171 Tenn. at 686-87, 107 S.W.2d at 983-84, they have also been viewed as "interdependent" because their functions overlap. *State v. King*, 973 S.W.2d 586, 588 (Tenn. 1998); *Underwood v. State*, 529 S.W.2d 45, 47 (Tenn. 1975). By mandating these overlapping functions, the framers of our Constitution created an extensive system of checks and balances which gives each department the means to resist encroachment by other departments. *Anderson County Quarterly Court v. Judges of the 28th Judicial Circuit*, 579 S.W.2d 875, 878 (Tenn. Ct. App. 1978). It also gives each department the means to assure that the other departments conform their conduct to constitutional requirements.

The people of Tennessee, in the various Constitutions adopted since 1796, have decided how much governmental power to apportion to the Legislative Department and the other departments of government. *Tennessee Conservation League v. Cody*, 745 S.W.2d 854, 857 (Tenn. 1987); *Illustration Design Group, Inc. v. McCanless*, 224 Tenn. 284, 294, 454 S.W.2d 115, 119 (1970);

---

[10]Tenn. Const. art. II, § 3 vests all legislative authority in the General Assembly; Tenn. Const. art. III, § 1 vests the executive power in the Governor; and Tenn. Const. art. VI, § 1 vests the judicial power in the Supreme Court and the circuit, chancery, and other courts established by the General Assembly. The Constitution of Tennessee does not define the powers of each department in express terms. *Richardson v. Young*, 122 Tenn. 471, 493, 125 S.W. 664, 668 (1910). However, the Supreme Court of Tennessee recently restated a simplified description of each of these roles when it noted that "[t]he legislative branch has the authority to make, alter, and repeal the law; the executive branch administers and enforces the law; and the judicial branch has the authority to interpret and apply the law." *Richardson v. Tennessee Bd. of Dentistry*, 913 S.W.2d 446, 453 (Tenn. 1995).

*Richardson v. Young*, 122 Tenn. at 492, 125 S.W. at 668. Each of these constitutions has apportioned a "larger share" of governmental power to the Legislative Department. *Moore v. Love*, 171 Tenn. at 687, 107 S.W.2d at 984; *The Judges Cases*, 102 Tenn. 509, 528-29, 53 S.W. 134, 138 (1899). Thus, the General Assembly's power to enact laws is limited only by the explicit and implicit restrictions in the Constitution of Tennessee and the United States Constitution. *Perry v. Lawrence County Election Comm'n*, 219 Tenn. 548, 551, 411 S.W.2d 538, 539 (1967); *Williams v. Carr*, 218 Tenn. 564, 578, 404 S.W.2d 522, 529 (1966); *Beasley v. Cunningham*, 171 Tenn. 334, 338-39, 103 S.W. 18, 19 (1937). Included in this broad grant of power is the exclusive prerogative to control the expenditure of public moneys. *Peay v. Nolan*, 157 Tenn. 222, 228-29, 7 S.W.2d 815, 816 (1928); *State ex rel. Weldon v. Thomason*, 142 Tenn. 527, 534, 221 S.W. 491, 494 (1920).

The chief means of assuring that the General Assembly's conduct comports with the requirements of the Constitution of Tennessee is the power of the courts to invalidate legislative actions that violate the Constitution. Over one hundred years ago, Justice Peter Turney noted that the Constitution of Tennessee would be a "dead letter" without the judiciary's power to invalidate legislative acts on constitutional grounds. *Lynn v. Polk*, 76 Tenn. at 127; *see also Louisville & Nashville R.R. v. County Court of Davidson*, 33 Tenn. at 671 (holding that the Constitution's limitations on the General Assembly "would be worse than useless" if the courts did not have the power to determine whether the General Assembly's acts conflicted with the Constitution).

Thus, it is now beyond reasoned dispute that the courts have the sole authority to determine whether legislative actions comport with constitutional principles. *Richardson v. Tennessee Bd. of Dentistry*, 913 S.W.2d at 453; *Tennessee Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 148 (Tenn. 1993). However, the doctrine of separation of powers requires the courts to respect the General Assembly's considerable legislative discretion, *Helms v. Tennessee Dep't of Safety*, 987 S.W.2d 545, 549 (Tenn. 1999); *Riggs v. Burson*, 941 S.W.2d at 54, and to presume that legislative actions are constitutional. *Taylor v. State*, 995 S.W.2d 78, 85 n.7 (Tenn. 1999); *Holder v. Tennessee Judicial Selection Comm'n*, 937 S.W.2d 877, 883 (Tenn. 1996). These principles prevent the courts from usurping or infringing upon the General Assembly's policy-making role.

## IV.
### LIMITS OF CONSTITUTIONAL REVIEW

The courts are the final arbiters of the meaning of the Constitution of Tennessee. *Metropolitan Gov't v. Tennessee State Bd. of Equalization*, 817 S.W.2d 953, 955 (Tenn. 1991). They are not free to construe the Constitution of Tennessee arbitrarily, *Henley v. State*, 98 Tenn. 665, 681, 41 S.W. 352, 355 (1897), and their construction of constitutional provisions must respect the intentions of the persons who adopted the constitutional provision at issue. *Cleveland Surgery Ctr., L.P. v. Bradley County Mem'l Hosp.*, 30 S.W.3d 278, 281-82 (Tenn. 2000); *Shelby County v. Hale*, 200 Tenn. 503, 510, 292 S.W.2d 745, 748 (1956). These intentions are reflected in the text of the Constitution itself. *Hatcher v. Bell*, 521 S.W.2d 799, 803 (Tenn. 1974). Thus, the courts must be guided chiefly by the text of the Constitution, *Shelby County v. Hale*, 200 Tenn. at 510-11, 292 S.W.2d at 748; *Bank v. Cooper*, 10 Tenn. (2 Yer.) 609, 621-22 (1831) (Kennedy, J., concurring),

rather than their own subjective notions of popular will not reflected in the Constitution itself. *Stratton Claimants v. Morris Claimants*, 89 Tenn. at 512, 15 S.W. at 90; *Luehrman v. Taxing Dist.*, 70 Tenn. 425, 438 (1879).

When discharging their responsibility to construe the Constitution, the courts may not amend or alter the Constitution under the guise of construction. *Ashe v. Leech*, 653 S.W.2d 398, 401 (Tenn. 1983); *Moore v. Love*, 171 Tenn. at 693, 107 S.W.2d at 986. They must give the constitutional text its ordinary and inherent meaning. *State ex rel. Cohen v. Darnell*, 885 S.W.2d 61, 63 (Tenn. 1994); *Martin v. Beer Bd.*, 908 S.W.2d 941, 947 (Tenn. Ct. App. 1995). They must also construe the text in light of the practices and usages that were well known when the provision at issue was adopted. *Peay v. Nolan*, 157 Tenn. at 230, 7 S.W.2d at 817; *State ex rel. Witcher v. Bilbrey*, 878 S.W.2d 567, 573 (Tenn. Ct. App. 1994), and in light of the construction and analysis of earlier cases. *Dodds v. Duncan*, 80 Tenn. 731, 733 (1884); *Jenkins v. Ewin*, 55 Tenn. (8 Heisk.) 456, 475 (1872).

A constitutional challenge to legislative action requires the courts to measure the General Assembly's conduct against the applicable constitutional provisions. It does not empower the courts to second-guess the General Assembly's policy judgments, to superimpose their own views on the General Assembly, or to pass upon the wisdom or necessity of the General Assembly's policy decisions. *Baldwin v. Knight*, 569 S.W.2d 450, 452 (Tenn. 1978); *Louisville & Nashville R.R. v. County Court of Davidson*, 33 Tenn. at 668.

We have measured the 101st General Assembly's conduct against the provisions in the Constitution of Tennessee pertaining to the conduct of legislative meetings. Based on the plain requirements of these sections, we have determined that the 101st General Assembly and its members did not violate either Tenn. Const. art. I, § 19, Tenn. Const. art. II, § 22, or the Tennessee Open Meetings Act by holding meetings from which the public and the press were excluded. That is all we have decided. We have not decided whether or not these meetings violated Senate Rule 83(2) or House Rule 80(8). Nor have we decided whether the General Assembly's practice of holding secret meetings or of deciding to hold secret meetings without a public vote of any sort is or is not consistent with good public policy or proper legislative procedure. Cognizant of our constitutionally assigned role in this tripartite government, we leave these decisions to the legislators themselves and ultimately to the citizens who elect them.

_____
WILLIAM C. KOCH, JR., JUDGE